**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-1749 and 20-1766
_____

GOVERNMENT EMPLOYEES RETIREMENT
SYSTEM OF THE VIRGIN ISLANDS,
                    Appellant in No. 20-1766

v.

THE GOVERNMENT OF THE VIRGIN ISLANDS;
COMMISSIONER OF FINANCE OF THE
GOVERNMENT OF THE VIRGIN ISLANDS,
                    Appellants in No. 20-1749
_____

On Appeal from the District Court
of the Virgin Islands
(D.C. No. 3:81-cv-00005)
District Judge: The Honorable Curtis V. Gomez
_____

Argued December 8, 2020

Before: SMITH, *Chief Judge*, CHAGARES and MATEY,
*Circuit Judges*

(Filed:  April 9, 2021)

Robert D. Klausner                                    [ARGUED]
KLAUSNER, KAUFMAN, JENSEN & LEVINSON
7080 N. W. 4th Street
Plantation, FL 33317

Cathy M. Smith
GOVERNMENT EMPLOYEES RETIREMENT SYSTEM
3438 Kronprindsens Gade
GERS Complex, Suite 1
St. Thomas, VI 00802
        *Counsel for Government Employees Retirement System*

Brigid F. Cech Samole
Katherine M. Clemente
Elliot H. Scherker                                    [ARGUED]
GREENBERG TRAURIG, LLP
333 Southeast 2nd Avenue
Suite 4400
Miami, FL 33131

Angel Taveras
WOMBLE BOND DICKINSON LLP
Independence Wharf
470 Atlantic Avenue
Suite 600
Boston MA 02110

Carol L. Thomas-Jacobs
OFFICE OF ATTORNEY GENERAL OF VIRGIN ISLANDS
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802

*Counsel for Government of the Virgin Islands and Commissioner of Finance of Government of the Virgin Islands*

Ian H. Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Suite 900
Washington DC 20001
        *Counsel for Amicus Appellees*

TABLE OF CONTENTS

**I.   Background and Procedural History** _____ 3

   A.  Legal Background _____ 3
      1.  *Creation of GERS in 1959* _____ 3
      2.  *The 1968 amendments* _____ 5
      3.  *The 2005 amendments* _____ 5

   B.  Procedural History _____ 7
      1.  *The 1981 complaint* _____ 7
      2.  *The 1984 consent judgment* _____ 8
      3.  *The 1994 amendment to the consent judgment* ____ 8
      4.  *The tangential 2001 action* _____ 9
      5.  *The 2016 enforcement proceedings* _____ 10

**II.  Jurisdiction and Standard of Review** _____ 15

**III. The GVI's Appeal** _____ 16

   A.  Principal Award to GERS _____ 17
      1. *The historical under-contributions fall within the consent judgment* _____ 17

-iii-

    2. *The GVI's historical under-contributions were
properly before the District Court* _____ 19

    3. *Direct contributions to GERS and the true-up process
do not offset the award*_____ 28

    4. *The expert reliably calculated the $18.9 million in
principal*_____ 31

  B.  Award of Fees and Interest to GERS _____ 32

    1. *The statutes are not intended only for willful
misconduct* _____ 33

    2. *The District Court erred by applying the statutes
retroactively* _____ 35

    3. *GERS's action was timely* _____ 42

**IV. GERS's Cross-Appeal** _____ 51

  A.  GERS's Textual Arguments _____ 54

  B.  GERS's Authorities _____ 59

  C.  The Parties' Historical Understanding _____ 62

**V.  Conclusion**_____ 66

_____

OPINION OF THE COURT
_____

SMITH, *Chief Judge*.

The promise of a pension is critical to the retirement security of many of us who work. And retirement security "is often compared to a three-legged stool supported by Social Security, employer-provided pension funds, and private savings."[1] When an employer's promise of deferred compensation goes unfulfilled, the expectations of many-a-pensioner are upended. That threat looms for a substantial share of the citizenry of the U.S. Virgin Islands because of the perilous financial condition of its Government Employees Retirement System ("GERS").

When a public-pension system reaches the point where it is actuarially unsound, the blame rarely lies with a single person, political party, or institution. Economic recession, unfunded legislative mandates, poor investment strategies—all can conspire to destabilize a pension system. And each bears responsibility for GERS's untenable financial state.

But GERS has also faced a unique challenge. Virgin Islands law seemingly fails to obligate anyone to fund GERS when employee-compensation-based contributions and associated investment returns fall short of the assets required, based

---

[1] Former Rep. Sander Levin, *Social Security at 75: Don't Mess with Success*, HUFFPOST (Aug. 16, 2010, 12:00 PM), http://www.huffpost.com/entry/social-security-at-75-don_b_ 683384.

on actuarial assessments, to meet future pension commitments. For decades, GERS has experienced annual deficits between its assets and projected liabilities to system participants. Its aggregate shortfall now stands at about three billion dollars—leaving the system on the brink of insolvency.

Yet the Government of the Virgin Islands ("GVI") is itself fiscally challenged and has at times failed to remit to GERS all the employer contributions it is statutorily mandated to make. GERS has repeatedly sued the GVI for these contributions—first in 1981, resulting in a consent judgment, and most recently in 2016, when GERS sought to enforce that judgment in court. GERS claimed that, as far back as 1991, the GVI had contributed tens of millions of dollars less than required by the statutory percentages of employee compensation. GERS also sought to compel the GVI to step into the billion-dollar breach, arguing that—independent of these fixed-percentage contributions—the GVI must fully fund GERS to the point of actuarial soundness.

With an appointed expert's help, the District Court awarded GERS an amount calculated to reflect the GVI's historical percentage-based under-contributions. We will affirm that award of principal. But the Court erred when it enhanced the award by applying late-arriving interest and penalty statutes retroactively. We will vacate the portion of the judgment to GERS that includes those enhancements and remand with instructions for the District Court to reduce its award accordingly. Finally, the Court determined that the consent judgment does not require the GVI to fund GERS for the delta between its assets and liabilities. We, too, find no anchor for this sweeping duty GERS seeks to impose on the GVI, so we will affirm the District Court's ruling in GERS's cross-appeal. Even were we to cut that obligation on a rationale made of whole cloth,

-2-

the system would remain insolvent.  The citizens of the United States Virgin Islands—population 106,405[2]—simply cannot pay the necessary billions.  The cure for GERS's chronic underfunding is not judicial but legislative—if not at the territorial level, then perhaps on Capitol Hill.

## I.  BACKGROUND AND PROCEDURAL HISTORY

We need not trace the long and winding road across laws, history, politics, and litigation that has brought the Virgin Islands' public-pension system to where it is today.  Instead, we hew to the legal framework relevant to the questions presented and to the procedural narrative by which this case and the parties' arguments have wended their way to us.

### A.  Legal Background

*1.  Creation of GERS in 1959.*  By passing Act 479, effective October 1, 1959, the unicameral legislature of the Virgin Islands ("the Legislature") created GERS as the retirement system for GVI employees.  GERS was "established as a trust, separate and distinct from all other entities"; endowed with "the powers and privileges of a corporation"; and required to transact all its business and hold all its assets in its own name.  Act of June 24, 1959, No. 479, §§ 701(c), 715(a), 1959 V.I. Sess. Laws 92, 94, 104.  The Legislature vested responsibility for operating GERS in a board of trustees, which has the power to authorize the purchase or sale of investments, make

---

[2] United States Census Bureau, *U.S. Virgin Islands Demographic Profile Summary File – 2010 Census of Population and Housing* (2013), *available at* https://www.census.gov/ schools/facts/u.s.%20virgin%20islands.

contracts, and "sue and be sued" under the GERS name. *Id.* § 715(b)(3), (6). The system was "established as a part of the Division of Personnel in the office of the Government Secretary," with the Director of Personnel acting as both administrator of GERS and secretary of the board. *Id.* § 715(c).[3]

Act 479 also purported to fund GERS. It implemented section 718 of the new Retirement Code, which provided first that "[t]he various obligations of the system shall be financed in accordance with actuarial reserve requirements from contributions by members, contributions by the employer, interest income, and other income accruing to the system." *Id*. § 718. Section 718 then required employees to contribute to GERS via a "deduction from compensation" at a rate of four percent, with an annual compensation cap. *Id.* It also set an annual compensation floor so that the GVI, as employer, would contribute four percent for an employee "whose minimum rate in his class of position is $1200 per annum, or less." *Id.*

Unlike the specified employee contribution rate, section 718 did not fix the rate for the GVI's employer contribution. Instead, Section 718 obligated the GVI to "make [employer] contributions concurrently with the contributions by members in an amount which, if paid during such service, and added to the members' contributions, together with regular interest, will be sufficient to provide actuarial reserves" for the payment of benefits under the system. *Id.* These concurrent employer contributions were to "be determined by applying a percentage rate to the aggregate compensation of the members for each regular

---

[3] In 1987, the Legislature amended section 715 to classify GERS as an "independent and separate agency" of the GVI. Act of June 24, 1987, No. 5265, § 1303(a), 1987 V.I. Sess. Laws 92, 97; *accord* 3 V.I.C. § 715(a).

payroll period." *Id.* Section 718 provided for an annual computation "of the actuarial reserve requirements" of the system and, in a provision reminiscent of its first sentence, looked for financing to "contributions by the members as above provided and by contributions by the employer." *Id.*

2. *The 1968 amendments.* In 1968, the Legislature passed Act 2098, which amended section 718. Act of February 8, 1968, No. 2098, 1968 V.I. Sess. Laws, Pt. I, 9. Act 2098 divided section 718 into subsections, with its first sentence on "actuarial reserve requirements" becoming subsection (a). *Id.* § 718(a). Act 2098 retained the four-percent employee contribution rate but changed the compensation caps and minima. *See id.* § 718(b), (c). It also slightly modified the provision for annual computation of the system's actuarial reserve requirements. *Id.* § 718(e). In a gloss on the original language of subsection (f), Act 2098 provided that "[t]he employer shall make contributions which together with the members' contributions and the income of the system will be sufficient to provide adequate actuarially determined reserve for the annuities and benefits herein prescribed." *Id.* § 718(f). And for the first time, the employer's contribution rate was fixed at a percentage of employee compensation—on a temporal gradient from 4.00% for the period before July 1, 1968 to 7.63% for the period after July 1, 1971—by the terms of subsection (g). *Id.* § 718(g). Both employer and employee contributions were to be paid into the system each payroll period. *Id.* § 718(h).

3. *The 2005 amendments.* Relevant amendments were later adopted when the Legislature passed the Retirement System Reform Act of 2005. Act of Nov. 2, 2005, No. 6794, 2005 V.I. Sess. Laws 380.

First, the bill added new subsections to section 704. That section now provides that "[r]etirement contributions paid for a prior period, whether by employer or by member, must be charged a delinquent fee of 1.5% for each calendar month or part thereof that paid [*sic*] contributions should have been paid."  3 V.I.C. § 704(q).  Such delinquent contributions "include[] prior period contributions due to incorrect wages and contributions from an earlier report or wages and contributions that should have been reported, but were not." *Id.*  The 1.5 percent "assessment may not be waived," *id.*, unless the GERS administrator in "exceptional circumstances" grants a waiver—and then, "only once for an employer during any one fiscal year." *Id.* § 704(r).

Second, the 2005 amendments require the accrual of interest on delinquent contributions to GERS.  Under the new provision, "[w]henever any agency, department[,] instrumentality, or employer fails to make timely contributions, interest shall accrue on the amount of the contributions not paid based on the system's domestic fixed income investment rate of return not to exceed the rate of 9%." *Id.* § 736(b).

Third, the Legislature amended existing provisions of section 718 by, among other things, adding that "the Board may actuarially determine the rate of contribution for members and employers of the system," *id.* § 718(a), and that "[t]he employer and employee contributions must be paid to the system within ten days after the closing of each payroll period," *id.* § 718(h).  The Board, however, "may not increase

rates, in addition to rates already in effect, by more than 3.0% over a five-year period." *Id.* § 718(b).[4]

Finally, the 2005 act codified section 734, under which "[a]ll payments required by this chapter to be made by the employer to the retirement fund are continuing obligations of the Government." *Id.* § 734. This provision ensures that "funds owed to the system by the employer should never be capable of escaping payment due to a statute of limitations." V.I. 26th Legis., Bill No. 26-0071, Bill Summary, Section 21.

## B. Procedural History

*1. The 1981 complaint.* Exercising its "power to sue and be sued in its own name," GERS filed a complaint in 1981 against the GVI and its Commissioners of Finance in the District Court of the Virgin Islands. *Emps. Ret. Sys. of Gov't of V.I. v. Quinn*, No. 3:81-cv-5 (D.V.I.), Compl. ¶ 2; JA754.[5] GERS alleged that the Commissioners had failed to timely remit several pay periods' worth of employee contributions to GERS and commingled these funds with the GVI's. GERS also alleged that the GVI had failed to timely remit to GERS "its matching retirement contribution of 11%," as required by

_____

[4] This constraint on GERS's rate-setting ability resides in the subsection of the statute on employee contributions. But GERS seems to understand that it equally applies to the employer rate. Indeed, GERS's inability to unilaterally increase the GVI's required employer contribution percentage is arguably what makes GERS's cross-appeal justiciable. We express no opinion on the scope of GERS's authority under section 718(b).

[5] Citations preceded by "JA" are to the parties' Joint Appendix.

statute, to the tune of nearly $500,000. 1981 Compl. ¶ 9; *see also id.* ¶ 4 (noting GVI's responsibility "to contribute 11%" as "the employer"). GERS requested injunctive relief ordering the Commissioners and the GVI to timely pay GERS all funds due and owing, preventing the Commissioners from commingling funds, and restraining the GVI "from future withholding of matching contributions." *Id.* at 3. GERS also sought interest of at least 18 percent annually on all funds due and owing, as well as attorneys' fees and costs.

*2. The 1984 consent judgment.* After written and oral discovery, the parties entered into a consent judgment in 1984. The judgment acknowledged that the GVI's Commissioner of Finance "receives and releases employee and employer retirement contributions." JA113. So it obligated "defendant, Commissioner of Finance, [to], within thirty (30) days of each payroll period, certify and pay into the Employees' Retirement System Fund the total amount due of employee and employer contributions as defined in Title 3, Section 718." JA113–14. The judgment recognized that "[a]t this time, the Court does not have jurisdiction to compel the payment of the legal rate of interest by the Commissioner of Finance on deliqneunt [*sic*] employee and employer contributions." JA114. But it also provided that "if an act is established by the Legislature, authorizing the payment of interest, this Consent Judgment shall be amended to reflect such change." *Id*. A Virgin Islands assistant attorney general executed the consent judgment on behalf of all defendants.

*3. The 1994 amendment to the consent judgment.* In March 1994, four members of GERS individually filed a federal lawsuit against GERS, several of its trustees, and the GVI alleging chiefly that the GVI had been dilatory in making

required payments to GERS under the consent judgment. *See Molloy v. Monsanto*, Civ. No. 1994-30, 1994 WL 326237, at *1 (D.V.I. June 9, 1994). Among the motions filed by the *Molloy* plaintiffs was a motion to enforce the consent judgment, seeking to require the GVI to remit employee and employer contributions to GERS within 30 days of each payroll period. *Id.* That motion, although filed in *Molloy*, was "considered as having been filed in the litigation that produced the consent judgment," *id.* at *1 & n.6, and the District Court denied it without prejudice. *Quinn*, 1994 WL 326224, at *1 (D.V.I. June 9, 1994) (noting allegation that "the amount of GERS money in the government's bank account has increased more than fifteen fold since December 1984").

Hoping to remedy these and other issues related to the consent judgment, GERS and the GVI jointly asked the District Court to modify it. The modified consent judgment, entered in April 1994, ordered that a separate interest-bearing bank account in the name of GERS be created for the Commissioner to use when depositing employer and employee contributions, "interest[,] and all other monies received of every kind and description belonging to the System." JA316. The parties also agreed on an auditing process, deposit logistics, and an investment interest allocation methodology. The provisions of the 1984 consent judgment were otherwise retained. Upon completion of motions practice, and following conferences with the District Court, any disagreement between the parties about the amended consent judgment seemed to have dissipated by late 1994.

*4. The tangential 2001 action.* In 2001, GERS sued the Governor of the Virgin Islands, the Legislature, and the GVI seeking to compel the payment of contributions required under discrete 1994 legislation that enacted a special early retirement

incentive program aimed at avoiding layoffs of certain employees. *See, e.g.*, *Gov't Emps. Ret. Sys. v. Turnbull*, 134 F. App'x 498, 500 (3d Cir. May 16, 2005); *see also* 3 V.I.C. §§ 718c, 718(j). That legislation included a financing mechanism requiring the GVI to make special quarterly contributions to GERS to compensate for employee contributions lost because of the early retirement of incumbent contributors. GERS alleged that the 1994 legislation and related amendments did not put in place an adequate financing structure, and thus unconstitutionally impaired an implied contract between the GVI and its employees, in violation of Article 1, Section 10 of the U.S. Constitution.

The District Court in *Turnbull* dismissed GERS's complaint, holding that GERS failed to state a cognizable Contracts Clause claim. *Gov't Emps. Ret. Sys. v. Turnbull*, No. 01-cv-69 (D.V.I. Jan. 23, 2004). We affirmed, albeit on ripeness grounds. We held that GERS "failed to establish a justiciable case or controversy" because "no GERS members have suffered any harm" and there was "no evidence in the record that any GERS members have been denied, or are about to be denied retirement benefits, or were otherwise injured as a consequence of the claims alleged." 134 F. App'x at 501.

5. *The 2016 enforcement proceedings.* In 2016, GERS moved to enforce the consent judgment, alleging that the GVI had violated section 718(f) by failing to fund GERS for the entire delta between its assets and its liabilities to pensioners. GERS referred to this supervening obligation, over and above the fixed-percentage employer contributions spelled out in section 718(g), as the GVI's "actuarially determined employer contribution" or "ADEC." JA89–93. Then, in 2017, GERS moved on an emergency basis to enforce the consent judgment because, for several months beginning in late 2016, the GVI

-10-

withheld wholesale its employees' and its own employer fixed-percentage contributions.  GERS filed both enforcement motions in the 1981 *Quinn* action, under its case number and caption.  And both motions sought enforcement through a finding that the GVI was in contempt of the consent judgment or, alternatively, by recourse to the District Court's "general equitable powers."  JA293–94; JA515.  The GVI ultimately admitted to the blanket withholding of fixed-percentage contributions, the District Court found a breach of the consent judgment, and the GVI then repaid a total of about $36 million—which included principal and interest—by July 2018.

The proceedings next focused on whether what had occurred was an isolated breach or whether the GVI had failed to remit fixed-percentage contributions to GERS in any prior period.  GERS's administrator testified that "missing employer contributions going back years are still outstanding."  JA1748.  (According to GERS publications, "[t]he issue of prior periods missing employer contributions" first surfaced with the implementation of a new computer system in March 2012.  JA3055; JA3082; JA3107.)  GERS calculated that the GVI owed over $72 million in previously missed employer contributions, including interest and penalties, through the end of 2017.  Based on a sample population of employees, the GVI claimed that it owed GERS just a few hundred dollars.  Because of the disparity in the parties' calculations, the District Court appointed an independent expert, RSM US LLP ("RSM"), to determine the extent of the GVI's arrears for prior periods beginning in 1991 and running through December 31, 2018.  The GVI and GERS each had equal access to RSM's data and personnel, and equal obligations to provide records to and cooperate with RSM.

RSM examined all available payroll documents and records of contributions to GERS.  RSM concluded that the GVI

-11-

had indeed failed to contribute all that was required under the fixed percentages in force during various payroll periods dating back as far as 1991.[6] Based on detailed records covering 2010–2018, RSM determined that the GVI under-contributed to GERS during that period by about \$4.0–\$5.0 million. According to RSM, these under-contributions stemmed from clerical, accounting, and processing errors. In a February 5, 2020 order, the District Court adopted RSM's calculations, awarded GERS \$5.0 million in principal for the GVI's 2010–2018 under-contributions, and directed RSM to calculate the pre-2010 amounts and undertake an interest analysis. The Court also set a schedule for the parties to brief the appropriateness and amount of interest.

RSM concluded that the under-contributions during the 1991–2009 period were less certain because of gaps in the relevant pay records. The "[m]ost significant[]" impediment to its obtaining comparable detailed payroll and employment information for the 1991–2009 calculations was that the GVI had changed its payroll software at the end of 2009 without "migrat[ing] detailed historical payroll and employment information." JA4806. Making matters worse, "[t]he [GVI] server on which [the defunct software's] data was stored . . . was decommissioned and did not receive patching and maintenance in recent years." *Id*. Even so, RSM successfully retrieved from the decommissioned server annual payroll reports that included the GVI's historical determinations of each employee's pensionable wages. By subtracting known non-

---

[6] Over the same timeframe, RSM determined—based on data it characterized as incomplete—that GVI employees also under-contributed to GERS by some \$2.2 million. GERS elected not to pursue current or former GVI employees to recover that amount.

-12-

pensionable wages, such as overtime pay, from reported gross wages, RSM performed its own calculations of pensionable wages. Applying the statutory contribution percentages to the GVI's and to its own pensionable wage determinations yielded a significant variance between the two as to the GVI's historical contribution obligations. Accordingly, RSM went on to refine its calculations.

RSM began by sampling 20 employees and comparing the GVI's and its own calculation of each employee's pensionable wages with their salary information as documented in Notices of Personnel Action ("NOPAs"), which the GVI generates based on changes in an employee's pay or employment status. This comparison led RSM to assume that the GVI had properly calculated an employee's pensionable wages whenever its calculation was greater than 60 percent of RSM's own initial calculation. RSM thus adopted the GVI's calculations in every such instance across the entire set of raw pensionable wage data from 1991–2009, amounting in toto to 83 percent of the data inputs to RSM's findings for that period.

But for the remaining 17 percent, RSM's and the GVI's pensionable wage calculations varied more significantly. RSM analyzed available payroll records for the 97 employees with the largest variance, requesting historical personnel records, including information relating to annual salaries, from both the GVI and GERS. It estimated an expected pensionable wage amount for these employees by using NOPAs, when available, and, when those were unavailable, GERS's annual benefit summaries. But this methodology accounted for only about 12 percent of the high-variance problem. For the remaining 88 percent of the high-variance data, which "likely erroneously include[d] certain non-pensionable wage types," RSM reduced its own pensionable wage calculations by a ratio derived from

-13-

a sample of 75 employees for whom there was "sufficient supporting documentation"—the average ratio between their document-supported pensionable wages and RSM's own initial pensionable wage calculations. JA4815–16. RSM then relied on both of its sets of adjusted pensionable wage calculations.

Using this methodology, RSM determined with 95 percent confidence that the GVI's 1991–2009 under-contributions fell within an interval from about $11.6 million to $15.8 million. The District Court chose the statistical midpoint of this range and, in an April 3, 2020 order, awarded GERS $13,860,879 (hereinafter rounded to $13.9 million) in principal.

In calculating interest and fees, RSM applied the 2005 interest and delinquency-fee statutes to the balance of under-contributions the GVI accumulated before the statutes' effective date and, alternatively, only to contributions the GVI missed on or after that date. In its April 3 order, the District Court adopted the former calculation and awarded GERS $43,161,354 (hereinafter rounded to $43.1 million) in interest and penalties on the GVI's $13.9 million in under-contributions from 1991–2009. Based on RSM's calculations, the Court also awarded GERS $6,121,273 (hereinafter rounded to $6.1 million) in interest and delinquency fees on the $5 million in principal for the 2010–2018 under-contributions. The District Court's award to GERS for all the GVI's under-contributions from 1991–2018, inclusive of interest and penalties, totaled about $68 million.

Finally, the District Court granted judgment to the GVI on GERS's motion to enforce the consent judgment with respect to the ADEC obligation. The Court reasoned that the

-14-

consent judgment, which obligated the GVI to make its employer contributions to GERS within 30 days of each payroll period, conflicted with GERS's proffered ADEC obligation, which would obligate the GVI to fund GERS in accordance with the annual actuarial analysis ordered by the Retirement Code.

The GVI appealed the District Court's award of principal and interest, and GERS appealed the District Court's denial of its motion to enforce the consent judgment as to the alleged ADEC obligation.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the District Court's February 5, 2020 and April 3, 2020 orders under 28 U.S.C. § 1291.[7] The District Court had jurisdiction over GERS's original 1981 action under Section 22 of the Virgin Islands Revised Organic Act of 1954. 48 U.S.C. § 1612. Its jurisdiction to hear GERS's motion to enforce stems from United States Public

---

[7] The February 5, 2020 order awarding GERS principal for the 2010–2018 period was not listed in the GVI's Notice of Appeal. Federal Rule of Appellate Procedure 3(c)(1)(B) requires that the Notice "designate the judgment, order, or part thereof being appealed." That said, we liberally construe the requirements of Rule 3(c). *Pacitti v. Macy's*, 193 F.3d 766, 776 (3d Cir. 1999). "[W]hen an appellant gives notice that he is appealing from a final order, failing to refer specifically to earlier orders disposing of other claims . . . does not preclude us from reviewing those orders." *Shea v. Smith*, 966 F.2d 127, 129 (3d Cir. 1992) (citation omitted). When, as here, there is a connection between the specified and unspecified orders, review is appropriate. *Pacitti*, 193 F.3d at 777.

-15-

Law No. 98-454, 98 Stat. 1732, 1738, sec. 703(b) (codified at 48 U.S.C. § 1612 note (Jurisdiction of District Court Over Pending Cases)).

We review the District Court's interpretation and construction of the consent judgment de novo. *Holland v. N.J. Dept. of Corr.*, 246 F.3d 267, 277–78 (3d Cir. 2001). We also review statutory constructions de novo. *United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020). We review any mixed questions of fact and law de novo insofar as "the primary facts are undisputed and only ultimate inferences and legal consequences are in contention." *U.S. Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 176 (3d Cir. 1981). But when the mixed questions require a district court to make case-specific factual conclusions, our review is deferential—examining the record for clear error. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967–69 (2018).

Interpreting an issue of Virgin Islands law that the Virgin Islands Supreme Court has not ruled on requires us to "predict how [that court] would decide" the matter. *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 n.3 (3d Cir. 2007).

## III.    THE GVI'S APPEAL

The GVI raises a hodgepodge of objections to the District Court's judgment for GERS on the issue of historical under-contributions. The challenges can be sorted into attacks on the District Court's (A) award of $18.9 million in principal to GERS and (B) enhancement of that principal with $49.2 million in interest and fees. We will affirm the District Court's award of $18.9 million in principal to GERS. We will also affirm its award of $6.1 million in interest and fees for the

2010–2018 period. But the District Court erred by applying the interest and delinquency fee statutes to enhance arrears that the GVI accumulated before those statutes' effective date. We will therefore vacate the $43.1 million enhancement for the 1991–2009 period and remand with instructions.

## A. Principal Award to GERS

The GVI contends that (1) its under-contributions to GERS from 1991–2018 are beyond the scope of the consent judgment; (2) the issue of whether it under-contributed to GERS was not properly before the District Court; (3) certain of its direct contributions to GERS and the process of "truing up" contributions at the time of an employee's retirement offset the $18.9 million award; and (4) the portion of the award covering the 1991–2009 period rests on unreliable data.

There is no merit to any of the GVI's arguments.

*1. The historical under-contributions fall within the consent judgment.* The GVI argues that the consent judgment was limited to requiring timely biweekly contributions to GERS. This was different in kind, the GVI claims, from failing to remit all funds that have since been determined were required under the percentages set by statute. But the GVI's argument conflicts with the text of the consent judgment and section 718, both of which require mathematical accuracy.

That the "biweekly contributions were correct when made and later circumstances may have required an increased contribution," Appellants' Reply Br. 6, is beside the point because the consent judgment and statute are formulaic. A consent decree is interpreted as a contract, with its scope "discerned within its four corners, and not by reference to what

-17-

might satisfy the purposes of one of the parties to it." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971)).  Under the consent judgment, the GVI must pay GERS "the *total amount due* of employee and employer contributions as defined in Title 3, Section 718."  JA113–14 (emphasis added).  Section 718 in turn sets forth, first, the fixed-percentage framework for deducting employee contributions from paychecks.  3 V.I.C. § 718(b), (d).  It then requires "[t]he employer" to "contribute" to GERS in "an amount paid upon a percentage of employees['] compensation" after each pay date, and specifies certain percentages and dates of increase.  *Id*. § 718(g); *see also id.* § 718(h).  A straightforward reading brooks no argument that funds demanded by the statutory percentages are unrecoverable if inadvertently withheld, whether due to clerical errors or other circumstances.  The Retirement Code prohibits both the employer's intentional "refusal" and unintentional "failure" to pay.  *See id.* § 736(a) ("Neither the government nor any agency, department, or instrumentality may *fail* or refuse *to pay* the employer's contribution *required by this chapter* within the applicable time limitation." (emphases added)); *accord id.* § 704(s); *see also id.* § 704(q) (classifying as "delinquent" and subject to enhancement "prior period contributions due to *incorrect wages*" (emphasis added)).

Granted, a consent decree's reach is limited by "the general scope of the case made by the pleadings." *Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1538 (3d Cir. 1984) (quotation omitted).  But GERS's 1981 complaint made the case that the GVI had failed to contribute the full amount that was required of it as employer.  *See, e.g.*, 1981 Compl. ¶¶ 4, 9 (alleging that GVI failed to timely remit to GERS "its matching

retirement contribution of 11%" as "the employer"). And it sought an order compelling the GVI to pay all funds due and owing, including the withheld employer contributions, as well as restraining the GVI "from future withholding of matching contributions." *Id.* at 3. So the general scope of GERS's original complaint jibes with the dictates of both the consent decree and section 718. And even assuming some dissonance between the allegations in the 1981 complaint and the GVI's under-contributions here, we are loath to slice and dice them in order to depart from a plain reading of the consent judgment— particularly given the vintage of most of the relevant facts. *See, e.g.*, *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998) (noting that a court should not "strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with [the court's] own conception of its purpose").

We thus conclude that the consent judgment obligated the GVI to make the under-contributions that were the subject of the District Court's award of principal.

*2. The GVI's historical under-contributions were properly before the District Court.* The GVI raises the corollary argument that its liability for historical under-contributions to GERS was not properly before the District Court. To be sure, GERS's enforcement motions that spawned the District Court's evidentiary hearings sought first to impose the so-called ADEC obligation at issue in the cross-appeal, and then to recover contributions that the GVI had intentionally refused to pay GERS beginning in late 2016. In the latter motion, GERS alleged that the GVI stopped timely and fully paying fixed-percentage contributions in 2016 and into 2017, and attached a sworn affidavit from the GERS administrator to support those factual allegations. But GERS did not, in these motions, claim a systemic "unintentional" breach redolent of

-19-

the GVI's legacy under-contributions, nor did it seek fixed-percentage deficiencies stretching back decades. That said, we are not troubled by the absence of this issue from either the enforcement motions or the initial proceedings.

First, we cannot say that the District Court clearly erred by concluding that the GVI's historical under-contributions were systemically intertwined with the breaches GERS asserted. Based on GERS's motions, the District Court received evidence from both sides about the extent of the GVI's unpaid liabilities. The District Court then heard testimony about the GVI's various instances of nonpayment over the years, amid the backdrop of GERS's litigation against the GVI for unpaid contributions in the 1980s, 1990s, and 2000s. After hearing the GVI's argument that "the indispensable predicate" to GERS's recovery of missing prior-period contributions was "some sort of supplemental pleading" or "motion that lays [it] out," the District Court ruled that nothing "precludes a court from undertaking its own inquiry to determine . . . the depth and breath [*sic*] of th[e] breach" that "a party points out."[8] JA3451–71 ("[A] party certainly doesn't take the role

_____

[8] The award to GERS of the GVI's contribution deficiencies for the 1991–2018 period did not come with an express written conclusion that the GVI breached the consent judgment. The GVI raises this as part of its argument against expanding the scope of GERS's claims to embrace the historical under-contributions. But the District Court made relevant findings and a ruling of breach on this specific issue. For example, at a November 2018 hearing, before instructing the parties to present evidence to value the 1991–2018 missing fixed-rate contributions, the District Court stated:

of the Court into its hands when it makes suggestions."). Hence the Court's appointment of RSM, the third-party expert, to examine the parties' records and opine on the full range of the GVI's arrears. Before RSM released its first report, the Court concluded that the GVI's intentional withholding of contributions beginning in late 2016 was only a "snapshot in time" of a larger "systemic failure to pay what is due and owing, which systemic failure [has] require[d] the Court to intervene on one, two, and multiple occasions [in the 1980s and 1990s]." JA3774–76.

When a district court "takes a raft of case-specific historical facts, considers them as a whole, balances them one against another," and makes a legal conclusion consisting "primarily" of "factual work," appellate courts should review that conclusion only for clear error. *U.S. Bank Nat'l Ass'n*, 138 S.

> Right now the evidence that has been largely presented by the GERS or by the Government of the Virgin Islands suggests that there is, one, a breach; and two, there is an amount that needs to be determined as to the depth and breadth of that breach. So if the Government wishes the Court to consider any other evidence that hasn't already been provided in the record, then the Government needs to present that sooner rather than later. I think we've covered this issue about the breach. . . . The breach needs to be closed.

JA1969. To take another example, the Court expressed at a subsequent hearing that "the government failed to meet its obligations to make payments on behalf of the employees and the employers," a "deficiency [that] needs to be remedied in short order." JA2970–71.

Ct. at 967–68 (reserving for de novo review situations where "applying the law involves developing auxiliary legal principles of use in other cases"). That is precisely what the District Court did in concluding that the GVI's under-contributions stretching back to 1991 were systemically related to the initial ADEC and 2016 alleged breaches at the heart of GERS's enforcement motions.[9] We decline to disturb the District Court's conclusion, which was based on the consent judgment, GERS's allegations, and decades of legal and factual development—all of which are memorialized, but only partially, in 6,000-odd pages of appendix that the parties have submitted on appeal. Simply describing the District Court's inquiry "indicate[s] where it (primarily) belongs: in the court that has presided over the presentation of evidence, that has heard all the witnesses, and that has both the closest and the deepest understanding of the record." *Id.* at 968; *see also Manning v. Energy Conversion Devices, Inc.*, 13 F.3d 606, 607 (2d Cir. 1994) (affirming district court order and rejecting argument that it "improperly expand[ed] the scope of the settlement agreement because . . . . district court's factual finding as to what [was] meant by the term 'parties' was not clearly erroneous").

Even were we to second-guess the District Court's conclusion that the breach GERS alleged was a snapshot of the breach later borne out by the evidence, we would still uphold inclusion of the GVI's legacy under-contributions in the litigation. If a claim, though never pleaded, is tried by express or

---

[9] Our reluctance to hold that the District Court could not chart this course finds support in a district judge's ability to issue civil contempt sanctions sua sponte after giving the contemnor notice and an opportunity to be heard. *See, e.g.*, *Carty v. Turnbull*, 144 F. Supp. 2d 395, 396 (D.V.I. 2001).

implied consent of the parties, the pleadings may be deemed to conform even after judgment or on appeal.[10] *Schultz v. Cally*, 528 F.2d 470, 474 (3d Cir. 1975) (citation omitted); *see also* Fed. R. Civ. P. 15(b)(2). Determining whether an issue was litigated by implied consent requires balancing three factors: whether the parties recognized that the unpleaded issue entered the case, whether the evidence supporting it was introduced

---

[10] The operative filings animating this round of proceedings were GERS's enforcement motions. Those motions are, strictly speaking, not pleadings within the meaning of Federal Rules of Civil Procedure 7 and 10. But in the context of enforcing the decades-old consent judgment based on a live complaint, GERS's contempt motions setting forth allegations of breach are, in substance, pleadings. *See, e.g., Pleading*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] formal document in which a party to a legal procedure (esp. a civil lawsuit) sets forth or responds to allegations"). The parties shared this understanding in the District Court. For example, the GVI in its briefs referred to "the motion to enforce the Consent Judgment (Doc. #2)" as "essentially the operative pleading in this litigation." JA2463 (also describing what GERS "alleged" therein). And when counsel for the GVI argued that GERS needed to "plead" the issue of historical under-contributions, the District Court asked, "When you say 'plead,' do you mean a complaint?" Counsel responded: "Well, we're in the motion-to-enforce stage. But a motion that lays out [the under-contributions]. There certainly is no motion in the court's file that says anything like that, let us respond, let us take the discovery and we'll try it." JA3454–57. Our holding on this point is limited to the particular facts of this case and should not be taken to mean that garden-variety motions are "pleadings" that can be conformed to evidence via Rule 15.

-23-

without objection, and whether a finding of consent prejudiced the opposing party's opportunity to respond. *Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995) (citations omitted). The prejudice factor is the touchstone for granting leave to amend under Federal Rule of Civil Procedure 15(b). *See United States v. Hougham*, 364 U.S. 310, 316–17 (1960).

It is difficult to imagine how it could have been any clearer to the parties that a new theory of breach entered the case by, at the latest, November 2018. The issue of the GVI's historical under-contributions was expressly raised for the first time at a hearing on September 27, 2018, when the Court questioned the GVI's counsel for several minutes about this new variant of the original contempt issue. Then, on November 26, 2018, the Court again inquired about the issue with GVI counsel before hearing relevant testimony from GERS's administrator, and then instructed the GVI to respond to GERS's proffered under-contribution calculations. The Court reiterated in an order several days later that the GVI was to respond specifically to the witness's report summarizing these missing contributions. (The GVI's legacy under-contributions came to be called missed "prior-period" contributions, distinguishing them from the more current deficiencies first adjudicated in the proceedings.) Thereafter, so many hearings and briefing opportunities proliferated that it would be a waste of paper and ink for us to recount them all here. Evidentiary hearings targeted to this issue occurred in February, March, and May 2019, after which the Court appointed the third-party expert to determine the amount of the GVI's historical under-contributions. RSM then issued two reports in 2020, one each for 1991–2009 and 2010–2018, with attendant opportunities afforded both parties to furnish evidence, object to RSM's methodology, examine and cross-examine a representative of RSM, and

-24-

argue related matters of law to the Court. The first factor thus strongly favors a determination that the parties litigated the issue of the GVI's under-contributions by implied consent.[11]

Nor was there prejudice to the GVI. Though it opposed introduction of its legacy under-contributions into the case, the GVI fully litigated the issue in the above-mentioned evidentiary hearings, status conferences, and papers across the span of nearly two years. The GVI was hardly "denied a fair opportunity to defend and to offer additional evidence on th[e] different theory." *Evans Prods. Co. v. W. Am. Ins. Co.*, 736 F.2d 920, 924 (3d Cir. 1984) (prejudice where "the [new] the-

---

[11] Notwithstanding Rule 15's ostensible requirement of a "trial," pleadings may be deemed amended to conform to the evidence presented at hearings before a district judge. For example, in the context of *habeas corpus* proceedings, the Supreme Court of the United States "see[s] no reason why an evidentiary hearing should not [equate with a trial for Rule 15(b) purposes] so long as the [State] gave any sort of consent and had a full and fair opportunity to present evidence bearing on the claim's resolution." *Banks v. Dretke*, 540 U.S. 668, 704–05 (2004) (cleaned up). We, too, see no reason why the evidentiary hearings preceding the District Court's entry of judgment in this matter should not equate with a "trial" under Rule 15(b). Nor, seemingly, did the GVI. After the District Court noted that "in an enforcement it's a breach of a court order and it's a little bit different . . . than a trial on the merits," counsel for the GVI agreed: "when I say a trial [I mean] *an adversarial proceeding in which after the parties have taken discovery we can try the questions that Your Honor has identified*." JA3456–57 (emphasis added). That is what occurred below, and no party suggests otherwise.

-25-

ory . . . had not been squarely presented and litigated at any stage of the proceedings"); *see also Douglas*, 50 F.3d at 1236 (severe prejudice where implied amendment "allowed the jury to consider another theory of liability against Griffith without Griffith having had the opportunity to defend against this new claim"). We cannot conceive of anything the GVI might have done differently had its historical missed contributions been litigated in some other fashion.

We also glean from the extensive record before us no prejudice to the GVI's ability to assert legal defenses. Though the GVI could have sought to raise the statute of limitations against GERS in a separate action, we think it unlikely that any portion of such a case would have been time-barred. To begin with, by "continuing" the GVI's contribution obligations indefinitely, section 734 of the Retirement Code effectively defeats any statute-of-limitations defense at least for deficiencies incurred on or after its effective date in 2005.[12] At all events, Virgin Islands law prescribes a 20-year statute of limitations on actions to enforce a federal court judgment. 5 V.I.C. § 31(1)(B).[13] In view of the discovery rule, which we have

---

[12] We express no opinion on whether section 734 was intended to apply retroactively.

[13] Other courts have held that enforcement of consent decrees is subject only to equitable defenses—not legal defenses such as the statute of limitations. *See, e.g.*, *Bergmann v. Mich. State Transp. Comm'n*, 665 F.3d 681, 683–84 (6th Cir. 2011); *Brennan v. Nassau Cnty.*, 352 F.3d 60, 62–63 (2d Cir. 2003); *see also Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, C.J.) (holding that consent decrees are contracts

applied in Virgin Islands cases "when the injury or its cause is not immediately evident to the victim," *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir. 1989); *accord MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 202 (3d Cir. 2016), GERS could have brought a timely separate action for all the 1991–2018 under-contributions it recovered in these proceedings.[14] The parties agree that GERS did not discover the historical

---

from interpretive standpoint but equitable decrees from remedial standpoint "and therefore [are] subject to the usual equitable defenses"). We take Virgin Islands law at face value, without deciding whether to follow these other Circuits' approach.

[14] The Legislature exercised its power under the 1984 amendments to the Revised Organic Act of 1954, 48 U.S.C. § 1612, to vest the territorial courts (now the Virgin Islands Superior Court) with "original jurisdiction in all [local] civil actions regardless of the amount in controversy." 4 V.I.C. § 76(a); *Callwood v. Enos*, 230 F.3d 627, 631 (3d Cir. 2000). As the GVI concedes, the District Court of the Virgin Islands retained jurisdiction to enforce the consent judgment because the original action was "pending before the district court as of October 1, 1991, the effective date of the Virgin Island[s] Legislature's implementing legislation." *Isidor Paiewonsky Assocs., Inc. v. Sharp Props., Inc.*, 998 F.2d 145, 153 (3d Cir. 1993). Though we do not believe any of GERS's claims "go far beyond the Consent Judgment's scope," regardless, it would not have been "unfair in the extreme to allow GERS to . . . invoke[e] the district court's long-defunct local jurisdiction" over such claims. Appellants' Br. 48. The GVI makes no argument that a territorial court would have afforded it more procedural or substantive rights, or reached a different conclusion in applying Virgin Islands law, than did the District Court.

-27-

under-contributions until it implemented a new computer system in March 2012, and the issue was first testified to by a witness and taken up by the Court in these proceedings in September 2018. Until that time, it appears that the GVI was also unaware, and it has not argued that GERS's failure to discover the missed contributions sooner was unreasonable. So even if GERS's motions did not fairly implicate the GVI's legacy under-contributions, conforming the allegations to the claims litigated would not deprive the GVI of otherwise available legal defenses.

In sum, the District Court did not clearly err by resolving factbound mixed questions in favor of adjudicating the GVI's historical under-contributions as part of the breach that GERS alleged in its enforcement motions. Accordingly, the GVI suffered no prejudice from inclusion of that issue in the case and, in fact, fully litigated it.

*3. Direct contributions to GERS and the true-up process do not offset the award.* Next, the GVI urges that the District Court's $18.9 million judgment to GERS should be offset by the GVI's "direct contributions to GERS" of some $24 million since the beginning of 2015. Appellants' Br. 37–38. Relatedly, the GVI argues for an offset because the parties agreed to some sort of "settlement" under which GERS would reconcile the GVI's actual and required contributions for each employee upon the employee's retirement. *See* Appellants' Reply Br. 5–7, 12–13; *see also* Appellants' Br. 16–17, 26–27. These arguments miss the mark.

Evidence the GVI cites as supporting its direct contribution argument shows that amounts are appropriated, in the sum of $7 million annually beginning in the fiscal year ending

September 30, 2013, from the "Internal Revenue Matching Fund" to GERS. Act of July 5, 2011, No. 7261, § 13, 2011 V.I. Sess. Laws 84, 92; JA3108 (discussing Act 7261). This annual direct contribution requirement flows from separate legislation and does not speak of the GVI's contributions as employer. Nor does it suggest any relationship to the GVI's obligations to GERS under section 718.[15] *E.g.*, Act 7261, § 13 (providing for contribution "[n]otwithstanding any law or provision to the contrary"). The GVI's partial fulfillment of an annual fixed-sum contribution requirement does not entitle it to offset distinct contributions it owes GERS as percentages of employee compensation.[16]

Whether the true-up reconciliation process for retiring employees conceptually ensures no under-contributions, as the GVI argues, is beside the point. For starters, the "settlement agreement" to which the GVI attributes the true-up process is not in the record. All we can surmise is that, after discovering the under-contributions, the parties agreed to reconcile the GVI's actual and required contributions associated with an employee upon her retirement.[17] We see no evidence that this

---

[15] For the same reasons, the District Court's award is not an "unlawful sanction," as the GVI urges. Appellants' Br. 38–39.

[16] GERS reported on August 11, 2020, that it had "received $42 million [of the $56 million due] from the Internal Revenue Matching Fund under Act No. 7261." GVI's Suppl. App. at 5.

[17] We have also found oblique references in the record to GERS's unsuccessful attempts as of October 2013 to negotiate a settlement agreement for the prior ten months of missing

arrangement was intended to modify the GVI's obligations under the consent judgment, which would have required court approval. *See, e.g.*, *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983). What's more, the true-up process is a relatively recent phenomenon that could not cure the GVI's under-contributions linked to employees who retired prior to its implementation. And RSM's examination of a "test sample population" led it to conclude that "members who had retired" under the true-up process "were not part of the GERS Claim calc[ulation]."[18] JA3733. The true ups sampled were all for "employees [who] were not part of the GERS Claim, which suggests that they were retired or moved." JA3752. Nor do the equities support GERS forgoing contributions and associated investment returns to which it is entitled until an employee retires. As the District Court put it, "I don't think the [1981] Complaint was just talking about people who were applying to retire." JA1914. So the District Court could have reasonably concluded that none of the funds paid to reconcile contribu-

employer contributions, and to an unexecuted settlement agreement dealing with missing employer contributions from October 1, 2010 through December 31, 2012. These settlement efforts do not support the GVI's argument and suggest instead that out-of-court resolution of GERS's claims has persistently eluded the parties.

[18] In excluding true-up payments, RSM's 2010–2018 report noted that "review of [true-up] information provided to date has seemingly all related to employees outside the scope of the GERS claim," though the expert did "not receive[] a complete record of payments by the GVI to GERS for end-of-employment GERS settlements." JA4048.

-30-

tions associated with employees who retired after institution of the true-up arrangement should have been deducted from the award to GERS.

*4. The expert reliably calculated the $18.9 million in principal.* The GVI contends that the portion of RSM's analysis calculating 1991–2009 under-contributions turned on unreliable data because NOPAs imperfectly capture total compensation paid to a particular employee. RSM recognized as much in declining to rely on NOPAs for the 2010–2018 period.[19] But it did choose to rely on them in part to calculate under-contributions from 1991–2009 because of the dearth of other competent records. The GVI thus seems to contend that this portion of the expert's analysis flunked the reliability prong of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)—yet without citing that landmark precedent.

The GVI made this argument to the District Court, to no avail. We agree with the Court's finding that RSM's 1991–2009 methodology, described above in Section I.B.5, mitigated the problems of relying exclusively on NOPAs by benchmarking NOPA data against other sources of information, such as an employee's actual gross wages. And based on a sample of 10 employees with both NOPAs and GERS annual benefit summaries, RSM determined that the salary reported on GERS's records was, on average, within four percent of that reflected in the GVI's records. Finally, the GVI's embrace of

---

[19] The expert observed two types of inaccuracies associated with GERS's reliance solely on NOPAs to calculate what the GVI owed in 2010–2018 under-contributions: "a) employees [*sic*] actual hours worked may differ from hours contemplated in NOPAs, and b) employee's [*sic*] actual start and end dates may differ from dates included within NOPAs." JA4050–51.

the true-up process, with its substantial reliance on NOPAs, undermines its objection. Particularly when a defendant's poor recordkeeping confounds data inputs, as was the case here, "absolute certainty" in expert opinions is not required. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003); *see also Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1163 (10th Cir. 2013) ("Although plaintiffs must generally establish damages with specificity, some estimation is acceptable if necessitated in part by the Defendants' poor record keeping." (cleaned up)); *cf. Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) (articulating FLSA damages burden-shifting framework "where the employer's records are inaccurate or inadequate"); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("If the employer fails to produce accurate records about the employee's wages and hours, the court may then award damages . . . even though the result may only be approximate." (citing *Mt. Clemens*, 328 U.S. at 687–88)).

We thus have no basis to conclude that the District Court abused its discretion in admitting the expert testimony. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).

\* \* \*

Seeing no merit to any of the GVI's challenges to the District Court's award of principal, we will affirm the judgment insofar as it awards GERS $13.9 million for the 1991–2009 period and $5 million for the 2010–2018 period.

## B. Award of Fees and Interest to GERS

The GVI's second set of arguments goes to the District Court's $49.2 million award of interest and delinquency fees.

-32-

Although there was no statutory authority in 1984 on which these enhancements could be based, the consent judgment provided that it "shall be amended" if Virgin Islands law later authorized interest on delinquent contributions. JA114. Two statutes enacted in 2005 did just that: one imposing a 1.5 percent delinquency fee "for each calendar month or part thereof that paid [*sic*] contributions should have been paid," 3 V.I.C. § 704(q)–(r), and the other requiring interest "not to exceed the rate of 9%" on contributions not timely paid to GERS. *Id.* § 736(b). The District Court adopted a set of the expert's calculations that applied the two statutes to the GVI's accumulated arrears as of the statutes' effective date and to all its under-contributions after that date.

The GVI contends that the District Court improperly applied both statutes, and in three ways. First, the GVI argues that the statutes apply only to the failure to timely make biweekly contributions and not to the failures responsible for its under-contributions. Second, the GVI contends that the District Court applied them retroactively to contributions missed before their effective date, without the necessary legislative intent. Third, the GVI asserts that interest and fees on most of the under-contributions cannot be recovered due to the statute of limitations or laches. We address each of these arguments in turn, and see merit in only the second.

1. *The statutes are not intended only for willful misconduct.* The GVI maintains that the District Court should not have enhanced the $18.9 million with interest and delinquency fees because the GVI "timely made" employer contributions, which only later turned out to be insufficient, and because its under-contributions to GERS were not willful. Appellants' Br. 44, 48–52. But neither statute carries a scienter requirement; each speaks only of the unmodified failure to contribute. *See*

-33-

3 V.I.C. § 704(q) (imposing delinquency fee when "contributions should have been paid"); *id.* § 736(b) (triggering interest when "employer fails to make timely contributions"). In fact, the delinquency-fee statute seems to embrace non-willful conduct such as deficient "prior period contributions due to *incorrect wages*." *Id.* § 704(q) (emphasis added). The scienter-free focus of the two statutes jibes with other relevant provisions of the Retirement Code that proscribe both the "refus[al] to pay," which suggests an intentional act, and the mere "fail[ure] . . . to pay." *Id.* § 736(a). We typically refrain from reading into statutes words that plainly aren't there, *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020), and we refuse to do so here. Nor must a party show willfulness to enforce a court order. *Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir. 1994).

At all events, the District Court lacked authority to waive the interest and delinquency fees. For its part, the delinquency-fee statute applies necessarily ("must be charged"), subject only to the GERS administrator's granting a waiver in "exceptional circumstances beyond the employer's control." *Id.* § 704(q)–(r). Plainly, no waiver was granted here. The GVI cites no case authorizing a court to substitute for the GERS administrator in the waiver process, and authority from other contexts weakens that argument. *See, e.g.*, *United States v. Lauersen*, 648 F.3d 115, 116–18 (2d Cir. 2011) (per curiam) (holding that district court properly interpreted 18 U.S.C. § 3612(h) as authorizing only Attorney General, and not district courts, to waive all or part of delinquency and default penalties), *cert. denied*, 565 U.S. 959 (2011); 18 U.S.C. § 3612(h) ("The Attorney General may waive all or part of any interest or penalty under this section . . . if, as determined by

-34-

the Attorney General, reasonable efforts to collect the interest or penalty are not likely to be effective.").

The interest statute is also mandatory but, unlike the fee statute, provides no mechanism for waiver. Given the limited circumstances enumerated for delinquency-fee waivers, the interest statute's conspicuous lack of any comparable provision means that no waiver at all will be allowed. In short, a district court is not free to waive interest. *See Lauersen*, 648 F.3d at 116–17 (concluding that Congress did not implicitly grant waiver authority to district courts when, in other subsections of statute, it "explicitly detailed the circumstances under which . . . penalties could be waived"); *cf. Elkins v. Moreno*, 435 U.S. 647, 665–66 (1978) (characterizing absence of restriction in one part of statute as "pregnant" when contrasted with other parts of statute, which included that restriction).

The GVI's conduct was therefore subject to both interest and delinquency fees, and the District Court did not err in refusing to waive them.

2. *The District Court erred by applying the statutes retroactively.* The GVI next contends that the District Court should not have imposed interest and delinquency fees on under-contributions that the GVI accumulated before the interest and fee statutes' effective date: November 2, 2005.[20]

---

[20] Although in 1984 it could not "compel the payment of the legal rate of interest . . . on deliqneunt [*sic*] employee and employer contributions," the consent judgment provided that "if an act is established by the Legislature, authorizing the payment of interest, this Consent Judgment shall be amended to reflect such change." JA114. One might ask whether GERS's

-35-

failure to seek modification of the consent judgment in the wake of the new interest and delinquency-fee statutes forecloses its recovery of interest and fees. A cursory Reply brief mention aside, the GVI developed no argument for why the "shall be amended" language obligated GERS to file a motion to modify the consent judgment. The GVI's lone acknowledgment that "the Consent Judgment never was amended to include interest," Appellants' Reply Br. 10, suggests that the GVI forfeited this argument. *See, e.g.*, *N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 492 n.2 (3d Cir. 2020) (holding that "argument . . . vaguely presented without legal or factual support . . . is forfeited"); *Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 146 (3d Cir. 2017) (noting that we will not "reach arguments raised for the first time in a reply brief or at oral argument"); *In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) ("[B]ecause they fail to develop either argument in their opening brief, the Court holds that the Wettachs have forfeited these claims." (citation omitted)). Recall that GERS sought interest on the GVI's delinquent contributions in 1981, and the issuing court, by including the anticipatory provision about interest, ostensibly sought to impose it in the event and to the extent that Virgin Islands law later permitted. And after the District Court found that the GVI breached the consent judgment by intentionally withholding contributions from GERS beginning in late 2016, the GVI willingly repaid those amounts *with* interest and delinquency fees. So whether GERS needed to file what seemingly would have been a pro forma motion is neither an "exceptional circumstance" that favors reaching this unpreserved issue, *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001), nor a matter of "public importance" whose non-resolution could lead to a "miscarriage

The District Court rejected the GVI's argument that this would retroactively enhance its liability, and applied both statutes to the GVI's balance of missed contributions as of November 2, 2005—not just to contributions missed on or after that date. Neither the delinquency-fee provision nor the interest statute contains any express indication that the legislature intended retroactive application. And the GVI asserts, with no contrary indications from GERS, that "[t]here is no legislative history reflecting legislative intent to apply retroactively 3 V.I.C. §§ 704 and 736." GVI's Nov. 16, 2020 Legis. Hist. Ltr., Dkt. No. 57, at 2. The District Court also recognized as much. So the question is whether the statutes increase the GVI's liability for past actions. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280–81 (1994); *Atkinson v. Att'y Gen.*, 479 F.3d 222, 231 (3d Cir. 2007). If so, they have retroactive effect and cannot be applied to conduct antedating their effective date.

We agree with the GVI that the statutes have retroactive effect, and thus that the District Court impermissibly applied them retroactively. Before November 2, 2005, the GVI's liability for all its past under-contributions was fixed at their principal amount. By subjecting that principal to interest and fees under the statutes at issue, the District Court "increase[d] [the GVI's] liability for past conduct" and "attache[d] new legal

---

of justice." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005) (quoting *Loretangeli v. Critelli*, 853 F.2d 186, 189–190 n.5 (3d Cir. 1988)). Further, the 1994 modification to the consent judgment directed the GVI to remit to GERS "interest and all other monies received of every kind and description belonging to [GERS]." JA316. This language provides an alternative basis for allowing GERS to recover interest under the consent judgment once permitted by Virgin Islands law.

consequences to events completed before [their] enactment." *See Landgraf*, 511 U.S. at 266, 269–70, 281.

The District Court looked to an Eleventh Circuit case that addressed postjudgment interest to support applying the statutes to the GVI's pre-existing balance. Yet it is prejudgment interest that provides the better guide. In *Shook & Fletcher Insulation Co. v. Cent. Rigging & Contracting Corp.*, 684 F.2d 1383 (11th Cir. 1982), the Eleventh Circuit held that a new state law increasing the postjudgment interest rate applied to an unsatisfied judgment secured under a prior version of the law that had imposed a lower interest rate. *Id.* at 1388–89. Here, however, the 1984 consent judgment was not a money judgment, nor did it in any way determine the amount of the GVI's liability. And postjudgment interest does not relate to the substantive conduct underlying the judgment. By contrast, the District Court's application of interest and fees increased the GVI's liability for the very same conduct to which GERS sought to attach liability in the enforcement proceedings. For that reason and others,[21] we look for guidance to prejudgment interest cases such as *F.D.I.C. v. UMIC, Inc.*, 136 F.3d 1375 (10th Cir. 1998). In that decision,

---

[21] For one, a judgment represents the fixed starting point of a judicially determined obligation, one of which the obligor is actually or constructively aware. Increasing the GVI's liability for past conduct of which it was *unaware*, on amounts that had not yet been subjected to judicial determination, would work a significant extension of postjudgment interest doctrine. For another, the statutes amplify the GVI's liability for past events far more than was the case in *Shook & Fletcher*, because the GVI's conduct was previously subject to *no* interest at all, not merely a lower rate.

the Tenth Circuit held that a federal statute's prejudgment interest provision could not be applied to conduct giving rise to prejudgment interest liability that occurred before its passage. *Id.* at 1385–87. "A prejudgment interest award not only substantially increases monetary liability for proscribed conduct, but it is also very closely tied to the amount of harm done by that conduct. It has all the indicia of a substantive rule that cannot be applied retroactively without an instruction from Congress . . . ." *Id.*; *see also Trout v. Sec'y of Navy*, 317 F.3d 286, 291–92 (D.C. Cir. 2003) (reversing district court's award of prejudgment interest on backpay and attorneys' fees for periods before effective date of interest statute, based in part on *Landgraf*, because "conduct underlying the complaint, rather than the procedural posture of the litigation, has significance"). Likewise, application of delinquency fees and interest is closely tied to the amount of harm for which GERS sought recovery in court—missed employer contributions and associated lost investment income—and increases the GVI's liability for that conduct.

The facts here do not convince us that these applications of *Landgraf* are inapt. First, while the District Court rightly noted that the GVI's under-contributions were not "complete" at the time of the statutes' enactment, JA40–41 (citing *Landgraf*, 511 U.S. at 280), the retroactivity inquiry is more granular. It requires us to "determine the '*important event*' to which the statute allegedly attaches new legal consequences." *Deweese v. Nat'l R.R. Pass. Corp. (Amtrak)*, 590 F.3d 239, 251 (3d Cir. 2009) (quoting *Atkinson*, 479 F.3d at 230) (emphasis added). The Retirement Code makes clear that this event is the discrete occurrence of under-contributing to GERS for a particular payroll period. Even if the GVI's obligations to GERS spanned decades and are "continuing," 3 V.I.C. § 734, the

-39-

"event" of any single under-contribution was complete—and the delinquency incurred—once the applicable time after a payroll period passed without the GVI contributing the full amount required by the contribution rate in effect for that particular period.

Second, though our retroactivity analysis is "guided by considerations" of "reasonable reliance" and "settled expectations," *Atkinson*, 479 F.3d at 231, the GVI's lack of contemporaneous knowledge of the under-contributions—and thus its lack of actual reliance on the prior state of the law—does not remove the taint. As we stated in *Atkinson*, "[i]mpermissible retroactivity . . . does not require that those affected by the change in law have relied on the prior state of the law." *Id.* at 229 (citation omitted). And consider *Landgraf*. There, the Supreme Court "did not base its decision on the specific conduct of Landgraf's employer or on any reliance that either Landgraf or her employer may have had on the state of the law." *Id.* at 228 (citing *Landgraf*, 511 U.S. at 282–84). Rather, the Court "made a general analysis of the impact of the amendment" and found "retroactivity improper because the amendment instituted a legal change that attached a new legal burden to the proscribed conduct." *Id.* Likewise, in *Hughes Aircraft Co. v. Schumer*, 520 U.S. 939 (1997), "[i]t was the new legal burden imposed on events past, rather than the reliance on the former law by the person affected, which was the basis for holding" that the amendment at issue should not have been applied retroactively. *Atkinson*, 479 F.3d at 228–29 (citing *Schumer*, 520 U.S. at 943–45, 948). The GVI's lack of reliance might have colored the District Court's application of the statutes, but it is the new legal burden attached to GERS's past conduct that is dispositive.

Finally, GERS contends that applying the statutes only prospectively would frustrate their remedial purpose. But that is "frequently . . . true" yet "not sufficient to rebut the presumption against retroactivity." *Landgraf*, 511 U.S. at 285. Here, the text of the statutes suggests no remedial purpose—and the parties agree that there is no relevant legislative history. Without more, the fact that, before the statutes' enactment in 2005, GERS had unsuccessfully sued the GVI for under-contributing to a discrete early retirement incentive program does not suggest that the Legislature viewed the unavailability of interest and fees on all delinquent contributions as "failing [the Retirement Code's] purpose." *Cf. Silverlight v. Huggins*, 488 F.2d 107, 108–10 (3d Cir. 1973) (holding that statute waiving Virgin Islands tort immunity, after prior practice of passing special waiver legislation on individual basis was held unconstitutional, applied retroactively to causes of action accruing before its enactment given "sincere[] concern[] that . . . damaged citizens not remain uncompensated" and "reasons given for the introduction of the bill"). And the facts belie GERS's assertion at oral argument that the GVI passed the 2005 statutes to remedy GERS's lost investment income on then-existing § 718(g) deficiencies. Neither GERS nor the GVI knew of missing fixed-percentage contributions until 2012, seven years later.[22]

Absent a clear statement of retroactive application in the statutes' text or discernible express legislative intent to apply them retroactively, they cannot impose interest and penalties on contributions that the GVI missed before their effective

---

[22] The consent judgment lacks any suggestion that the GVI agreed to subject itself to retroactive operation of a statute that would otherwise only apply prospectively.

date.  We will vacate that portion of the District Court's judgment awarding $43.1 million to GERS in interest and fees for the 1991–2009 period, and remand with instructions to reduce those enhancements accordingly.[23]

*3.  GERS's action was timely.*  Finally, the GVI argues that the vast majority of its under-contributions are not subject to interest or fees because the payments were made outside the two-year statute of limitations applicable to an "action upon a statute for a forfeiture or penalty."  5 V.I.C. § 31(5)(B).  The GVI also maintains that GERS is barred by laches from recovering the enhancements awarded by the District Court.  We are unpersuaded and conclude that GERS's recovery of interest and fees is timely.  Even were we to disagree with the decisions of other Circuits holding that enforcement of consent decrees is subject only to equitable defenses, *see, e.g.*, *Bergmann*, 665 F.3d at 683–84; *Brennan*, 352 F.3d at 62–63; *see also Cook*, 192 F.3d at 695, and even assuming GERS's enforcement motions are subject to statutes of limitations,[24] the applicable limitations period would not bar GERS's recovery.

---

[23] In the set of calculations pertinent to the District Court's $13.9 million award of principal for the 1991–2009 period, RSM figured the total amount of interest and fees for under-contributions on or after November 2, 2005 at $6,804,260: $5,542,163 in delinquency fees and $1,262,096 in interest.

[24] The Virgin Islands' limitations periods apply to the "[t]ime for commencement" of new actions.  5 V.I.C. § 31 ("Civil actions shall only be commenced within the periods prescribed below.").  GERS's enforcement motions did not commence a new action but were filed in an existing one.

Contrary to the GVI's position, the award of interest and fees to GERS—both in form and substance—did not stem from an action "upon a statute for a forfeiture or penalty," but motions to enforce "a judgment or decree of any court of the United States . . . or Territory." 5 V.I.C. § 31(1)(B), (5)(B). So if any limitations period applies, it would be the 20-year statute of limitations discussed above rather than the two-year statute of limitations that the GVI invokes. *Id.* Just as GERS's proceedings to enforce the consent judgment against the GVI's under-contributions discovered in 2012 would be timely under the 20-year statute of limitations, so too its recovery of interest and fees on those deficiencies.

Nor does laches bar GERS's recovery here, though the District Court may have short-circuited some of the analysis by concluding that GERS is a "sovereign" immune from laches. JA30–35. We are not convinced that GERS is entitled to sovereign status and, for the reasons set forth below, conclude that the GVI's laches defense nevertheless fails on the merits.

A creature of statute, GERS was established as an "independent and separate agency" of the GVI with the "powers and privileges of a corporation." 3 V.I.C. §§ 715(a), 701(c). But unlike "all other semi-autonomous instrumentalities" of the GVI, the V.I. Legislature failed to recognize GERS as a tax-exempt entity when the system was created. V.I. 26th Legis., Bill No. 26-0071, Bill Summary, Section 1. Hence the provision in the 2005 amendments to the Retirement Act granting tax-exempt status to GERS. *See* 3 V.I.C. § 701(f). Endowed by statute with corporate powers and privileges, and taxed as a corporation rather than treated as an exempt government agency, GERS at its inception lacked some of the hallmarks of a sovereign government unit.

Likewise, endowing a government agency with the right to "sue and be sued" is persuasive evidence that the Legislature waived the agency's immunity from timeliness defenses such as laches and the statute of limitations.[25] *See, e.g.*, *U.S.V.I. Econ. Dev. Auth. v. Hypolite*, No. ST-16-CV-268, 2019 WL 451370, at *3 (V.I. Super. Ct. Jan. 28, 2019) (collecting Virgin Islands cases). This the Legislature did, granting the GERS board the power to "sue and be sued" in the GERS name and requiring that GERS assets be held in its own name and segregated from those of the GVI. 3 V.I.C. §§ 701(c), 715(b)(6). Territorial courts have held that a semi-autonomous agency chartered as a "public corporation," with its own assets and legal existence, that could "sue and be sued" lacked sovereign immunity from the statute of limitations. *Hypolite*, 2019 WL 451370, at *3. That conclusion may obtain for timeliness defenses involving GERS as well.

---

[25] Courts analyze immunity from the statute of limitations in tandem with immunity from equitable timeliness defenses, such as laches. *See, e.g.*, *Guar. Tr. Co. of N.Y. v. United States,* 304 U.S. 126, 132 (1938) (discussing purpose of exempting sovereigns from defense of laches and operation of statutes of limitations); *Dole v. Local 427, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*, 894 F.2d 607, 612 (3d Cir. 1990); *In re Hooper's Estate*, 359 F.2d 569, 578 (3d Cir. 1966) ("[T]he general principle that claims of the sovereign are not subject to the defenses of laches and the statute of limitations, is applicable to the Territory [of the Virgin Islands], unless expressly waived, and is implied in all its enactments." (citing *Bd. of Cnty. Comm'rs v. United States*, 308 U.S. 343, 351 (1939))).

What's more, Virgin Islands law suggests that "public corporations" generally, and GERS specifically, *are* subject to certain statutes of limitations—something inconsistent with the recognized exclusion of sovereigns from timeliness defenses where they sue in their own name or for their constituents' benefit. *See, e.g.*, *Hooper's Estate*, 359 F.2d at 578 ("[I]mmunity is based upon the public policy of protecting the citizens from damage to or loss of their public rights and property through the negligence of public officers." (citing *Guar. Trust Co. of N.Y.*, 304 U.S. at 132)). For example, ordinary limitations periods "shall apply to actions brought in the name of any *public corporation* in the Virgin Islands, or for its benefit, in the same manner as to actions by private parties." 5 V.I.C. § 34 (emphasis added). And a provision of the Retirement Code suspends operation of the statute of limitations as against GERS for certain obligations. *See* 3 V.I.C. § 740 ("Notwithstanding title 5 Virgin Islands Code, chapter 3, any payment due the retirement system for services, repayment of loans or mortgages, or for the repayment of any amounts due to error or overpayment are not extinguished by the statute of limitations . . . ."). Such a carve-out suggests that GERS may otherwise remain subject to statutes of limitations and not constitute a "sovereign" immune from timeliness defenses.

We do not decide whether GERS is a private, public, or quasi-public corporation or, for that matter, whether its status renders it immune from laches. All we decide in this regard is that GERS's immunity is too dubious a basis for rejecting the GVI's argument. That said, the GVI's laches argument fails on the merits. A party asserting laches as a defense must establish (1) an inexcusable delay in bringing the action and (2) prejudice. *See, e.g.*, *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999). The crux of the GVI's case

-45-

for laches is that GERS delayed too long "in seeking delinquency fees and interest," which prejudiced the GVI because the expert had "difficulty in locating and making use of old records and data entries." Appellants' Br. 54. Neither assertion holds water.

First, GERS's delay in bringing the enforcement proceedings that led to the award of interest and fees was excusable. After suing the GVI in 1981 and obtaining the consent judgment in 1984, GERS was in court to modify it in 1994. Then, in 2001, GERS sued the GVI for under-contributing to a separate early retirement incentive program. GERS appealed dismissal of that suit in 2005, and we affirmed for lack of ripeness because it was too soon to say that "GERS members have been denied, or are about to be denied retirement benefits." *Turnbull*, 134 F. App'x at 501. Having pursued its rights in court for decades, and following this defeat, GERS might have reasonably been wary of instituting further litigation when in 2012 it discovered the GVI's under-contributions. Instead, it waited to again sue the GVI until the pension system was just a few years from the brink. And in the interim, GERS tried to work with the Virgin Islands governor and the Legislature on pension funding solutions, even proposing remedial legislation.[26] The length of the delay in absolute terms was fairly

---

[26] The GVI maintains that we cannot consider facts about GERS's out-of-court efforts because they lie outside the record. But many of them can be found in this case's extensive record, and those that cannot are appropriate for judicial notice. *See, e.g.*, *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 & n.15 (3d Cir. 2006) (judicially noticing a New York Times article on content of settlement); *United States v. Pozsgai*, 999 F.2d 719, 731 (3d

modest, especially given the Virgin Islands' 20-year statute of limitations on enforcement of federal-court judgments and, as further context, the territory's six-year statute of limitations on actions to recover under a contract or "upon a liability created by statute." 5 V.I.C. § 31(1)(B), (3)(A)–(B). As noted above, GERS waited four years after discovering the missing fixed-percentage contributions to launch the proceedings that yielded the District Court's interest and fee award. *See, e.g.*, *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (noting that laches clock starts "when the plaintiff knew (or should have known) of the allegedly infringing conduct" and stops when "the lawsuit in which the defendant seeks to invoke the laches defense" is begun). That's well within the realm of reasonable delay, as shown by *Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009). There, we held that it was not inordinate delay to wait five years after entry of a judgment or injunction to initiate contempt proceedings. *See id.* at 496–97 (distinguishing *Univ. of Pitt. v. Champion Prods., Inc.*, 686 F.2d 1040 (3d Cir. 1982), where plaintiff waited 50 years to sue and there was no previously imposed injunction).

Second, the GVI's prejudice argument lacks the necessary predicate showings. The GVI appears to claim that GERS's delay exacerbated the lacunae in the pre-2010 records, which lie at the heart of the GVI's unsuccessful challenge to RSM's methodology. But the GVI does not explain how the state of those records would have benefitted had GERS sued nearer to 2012. In fact, according to RSM, the unavailability of detailed pre-2010 data was chiefly attributable to the GVI's institution of new payroll software at the end of 2009 without migrating the historical records or later performing mainte-

Cir. 1993) (appellate court may take judicial notice of matter not before district court).

nance on the decommissioned server. Even if records somehow would have been more robust had GERS sued earlier, any prejudice was shared by both parties. RSM did not structure its methodology with a thumb on the scale in favor of GERS because of evidentiary gaps. It examined the existing records provided by both parties and, with 95 percent confidence, calculated an interval into which the GVI's 1991–2009 under-contributions fell. Nor did the District Court, in adopting the statistical midpoint of that range, punish the GVI for having incomplete records. In arguing laches below, the GVI articulated no cognizable prejudice attributable to the passage of *decades* since entry of the consent judgment. Its argument here founders on even shallower shoals.

Finally, even if the requisites for laches were met, we would balk at applying the doctrine to bar GERS's recovery of interest and fees. To begin with, for many months after GERS began these proceedings in 2016, the GVI intentionally withheld from GERS all of its employees', and its own, fixed-percentage contributions. The GVI has claimed only that it "fell behind" due to unspecified "exigent circumstances."[27] Appellants' Reply Br. 12. But the record reveals nothing exigent that would sufficiently excuse this conduct. On the contrary, the GVI's Commissioner of Finance testified that these

---

[27] The parties have attributed much of the interregna in the District Court proceedings to the damage wrought by Hurricane Irma and Hurricane Maria, both of which occurred in September 2017. But the hurricanes cannot excuse the GVI's misconduct; the chronology doesn't fit. The GVI began withholding fixed-percentage contributions from GERS beginning in late 2016 and for months thereafter. And GERS brought its emergency enforcement motion as to these withheld funds in March 2017.

contributions were intentionally withheld because of garden variety capital concerns that led the GVI to de-prioritize its commitments to GERS—cash flow problems he could scarcely differentiate from those faced by the GVI *after* it resumed contributions.  Unconvinced, the District Court held that the GVI's conduct breached the consent judgment, and the GVI ultimately handed over some $36 million in principal and enhancements for these withheld contributions.  "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for" a court to "refus[e] to aid the unclean litigant." *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972).  The GVI can hardly invoke laches now after intentionally breaching a court order, rendering its hands unclean with respect to part of GERS's action.

Nor need we apply the equitable remedy of laches if doing so would undermine the public's interests in resolution of the affected claim.  *See, e.g.*, *Virginian Ry. v. Sys. Federation No. 40*, 300 U.S. 515, 550 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." (citations omitted)); *Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1042 (D.C. Cir. 1973) ("Equitable remedies depend not only on a determination of legal rights and wrongs, but on such matters as laches, good (or bad) faith, and *most important* an appraisal of the public interest." (emphasis added) (citation omitted)).  The economic health of the Virgin Islands rests to a large degree on the soundness of its public-pension system.  It cannot be over-emphasized that the central government is the Islands' largest employer.  GERS represents about 30 percent of the

Islands' gross domestic product. It "covers approximately 20% of the entire population of the Virgin Islands." JA3958–59. At oral argument, GERS estimated that about a third of the Islands' population contributes to GERS or depends on it for income. The system's receipt of tens of millions of dollars in interest and fees is of the highest public importance. We would decline to resolve the weighty issue of GERS's entitlement to those funds on grounds of laches even if the defense would otherwise seem to apply.

We therefore conclude that the GVI's timeliness defenses do not bar any component of the District Court's award of interest and fees to GERS.

\* \* \*

The consent judgment and applicable law require mathematical compliance, so the GVI's failures to contribute what was required by statutorily fixed percentages, even if inadvertent, breached the consent judgment. In proceedings that first centered on the GVI's failure to remit fixed-percentage contributions beginning in late 2016, the District Court later widened the lens—assisted by an appointed expert—and found a breach reaching back as far as 1991, when the GVI began shorting the percentage contributions to which GERS was entitled. We will not disturb that approach because the Court's factbound conclusion about the extent of the asserted breaches was not clearly erroneous and, at all events, because GERS's original pleadings and allegations in its enforcement motions may be deemed amended as necessary to encompass that recovery. Neither the GVI's direct contributions to GERS under separate funding legislation nor its compliance with a recent process designed to reconcile contributions paid and owed for a retiring employee demands an offset. And we perceive no abuse of

-50-

discretion in the District Court's reliance on the expert's methodology for calculating the 1991–2009 under-contributions. We will affirm the District Court's award to GERS of $18.9 million in principal.

GERS brought enforcement proceedings within about four years of discovering these under-contributions, so its recovery of interest and fees on those debts is timely. In fact, the District Court had no discretion to waive the interest and fees. But nothing suggests that the Legislature intended to apply the late-arriving interest and fee statutes retroactively. We will vacate the District Court's award to GERS of $43.1 million in enhancements for the GVI's 1991–2009 arrears and remand for imposition of a lesser award excluding interest and fees on contribution deficiencies that the GVI incurred before the statutes' effective date. Because there are no retroactivity problems associated with the District Court's award of $6.1 million in interest and fees for the 2010–2018 period, we will affirm that portion of the judgment.

## IV.    GERS'S CROSS-APPEAL

Even a judgment of tens of millions of dollars only postpones GERS's day of reckoning by a matter of months. So GERS appeals the District Court's separate ruling that the consent judgment does not obligate the GVI to contribute billions to actuarially equalize GERS's assets and its liabilities to pensioners. GERS derives this sweeping "ADEC" (short for "actuarially determined employer contribution") obligation from section 718(f), which requires the GVI to "make contributions which together with the members' contributions and the income of the system will be sufficient to provide adequate actuarially determined reserve for the annuities, benefits and administration of the System herein prescribed."

-51-

3 V.I.C. § 718(f). GERS interprets this provision to require the GVI to make GERS actuarially sound should the fixed-percentage contributions of the GVI and its employees, along with GERS's investment income, fail to do so. For its part, the GVI maintains that section 718(f) merely announces the Legislature's intent that the fixed-percentage contributions from both the GVI and its employees, as well as GERS's investment income, together yield an actuarially sound reserve for pension benefits.[28] The District Court rejected GERS's argument, reasoning that the employer contributions contemplated by the consent judgment and section 718 trace to payroll periods—something irreconcilable with the proposed ADEC's dependency on an annual actuarial accounting.

---

[28] At a hearing before the District Court, counsel for the GVI conceded that "[t]here is an obligation to pay" the ADEC but argued that it is "an obligation that is not part of this consent decree." JA1786–88 ("we're not disputing that" the GVI is statutorily obligated "to make the actuarially determined employer contribution"). Counsel for the GVI sought to walk back this statement in subsequent briefing and, before us, maintains that there is no such ADEC obligation. We will not tether our prediction of how the Virgin Islands Supreme Court would decide this issue to counsel's (apparently inadvertent) oral statement. It is not a binding "judicial admission" because whether the GVI is obligated under Virgin Islands law to make the ADEC contribution to GERS is an issue of law, not a fact susceptible of admission. *See, e.g.*, *Swift & Co. v. Hocking Valley Ry.*, 243 U.S. 281, 289–90 (1916) (putative admissions about "legal effect" are "inoperative"); *accord New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963), *cert. denied*, 376 U.S. 963 (1964).

We conclude that the Virgin Islands Supreme Court would refuse to read GERS's proffered ADEC requirement into section 718(f). The text of the statute and GERS's cited authorities do not support imposing an obligation solely on the GVI to fund GERS to the point of actuarial soundness. And although there is scarce legislative history relevant to the meaning of the provision, testimony of GERS representatives to the Legislature reveals that the GVI's employer contributions under section 718 have been understood for decades as limited to fixed percentages of employee compensation. The statutes are best read to require that the fixed-percentage contributions of employees and employers be calibrated to account for the changing actuarial needs of the system. But those same statutes do not provide a mechanism for keeping GERS actuarially funded if that fixed-rate funding structure comes up short—whether because of proliferating unfunded legislative mandates, GERS's own mismanagement, flawed actuarial projections, or the like.[29] We will therefore affirm the District Court's judgment on this issue.

---

[29] In dissent, our colleague attributes to us a reading of section 718(f) that "preclude[s] what Section 718 otherwise requires" and "bak[es] a funding shortfall into the statute." Dissenting Op. at 18. We have trouble understanding the recipe. To begin with, our dissenting colleague recognizes, as do we, that section 718(g) "has never had a [] rate increase cap" comparable to that on employee contributions. Dissenting Op. at 23. So his assertion that our reading of section 718 assumes the Legislature's "self-sabotage" in erecting "a hard-capped-contribution system," Dissenting Op. at 18, does not even survive to the end of the dissenting opinion. At all events, the Legislature's choice of an actuarially calibrated fixed-

-53-

## A. GERS's Textual Arguments

GERS's central statutory argument for imposing the ADEC obligation on the GVI is that not doing so would render section 718(f) superfluous.  If all section 718(f) does, GERS protests, is announce the Legislature's sanguine intention that the schedule of percentages suffice to fund the system, then section 718(f) has no independent content.  But GERS never explains why it is superfluous, particularly given the statute's amendment history, to interpret section 718(f) as requiring that the employer contribution percentages first spelled out in subsection (g) in 1968 not be fixed but dynamic over time in proportion to the evolving actuarial needs of the system.  It may well be that those percentages have *not* been accurately calibrated to the actuarial needs of the system, for whatever reason, but that provides no justification for a supervening ADEC obligation that would render superfluous the statute's percentage contribution mechanism.

---

percentage structure to meet the system's evolving needs does not *ensure* a shortfall.  The Retirement Code has often been amended to, for example, increase the contribution rates, change how those rates are set, and allocate responsibility for funding various pension entitlements—such as the costs of the special early retirement incentive program and the costs of administering the system, both of which are borne by the GVI.  That fixed-percentage contributions may well have been meeting the system's needs until the 1990s makes the charge of "self-sabotage" sound a bit overstated.  *See* Dissenting Op. at 18.  And, of course, GERS always had—indeed, has availed itself of—recourse to separate legislation to attempt to address underfunding, such as the $7 million lump-sum annual payments from the GVI that it secured.  *See supra* Section III.A.3.

To begin with, saddling the GVI alone with the obligation to fund GERS to the point of actuarial soundness is, at best, inconsistent with the text of section 718. And, at worst, imposing such an obligation contradicts the import of the statutory language. While section 718(f) requires the "employer [to] make contributions" that "will be sufficient to provide adequate actuarially determined reserve" for benefits to pensioners, the linkage between those phrases is "which together with the members' [i.e., employees'] contributions and the income of the system." 3 V.I.C. § 718(f). A more natural reading of section 718(f), then, is that actuarial soundness is a function of *all* of the following: the GVI's contributions as employer, its employees' contributions, and GERS's investment income earned through prudent financial decisions.[30]

---

[30] Our dissenting colleague tries to wield the last antecedent rule against our reading of section 718, applying the rule to section 718(f) to assert that "the limiting phrase 'shall make contributions' modifies the noun it immediately follows: 'employer.'" Dissenting Op. at 19–22. To start, we doubt that the last antecedent rule even applies here. The purported limiting language is only preceded by one antecedent: "The employer shall make contributions." That means there is no potential ambiguity for the interpretive canon to resolve, since the other candidates follow after that so-called limiting language. At all events, our point is simply that section 718(f) lacks the clarity needed to support a supervening obligation borne solely by the GVI to make GERS actuarially sound. So we look to, among other related provisions of the Retirement Code, an earlier subsection. *Cf. New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) ("We've long stressed the significance of the statute's sequencing." (citations omitted)); *Pac.*

Even if this provision—by naming the GVI first and then, in a subsidiary clause, mentioning employees and investment income—could somehow be read to elevate the GVI's responsibility, a preceding subsection vitiates that reading by equalizing the input of *all stakeholders* to the actuarial soundness of the system: "The various obligations of the System shall be financed in accordance with actuarial reserve requirements from contributions by members, contributions by the employer, interest income, and other income accruing to the System." *Id.* § 718(a). Granted, the first sentence of subsection (a) may be redundant of subsection (f). But GERS seeks to give content to the latter that would seemingly *contradict* the former. Such an approach finds no support in canons of statutory construction. *See United States v. Bass*, 404 U.S. 336, 344 (1971) (recognizing that "courts should interpret a statute with

*Emplrs. Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012) (highlighting importance of "a big-picture look at the [provision's] place in the [statute's] overall structure," with attention to how "structure" and "sequen[ce]" "create an obligation"). Section 718(a) independently supplies that "[t]he various obligations of the System shall be financed in accordance with actuarial reserve requirements from contributions by members, contributions by the employer, interest income, and other income accruing to the System," with the Board able to periodically "*actuarially determine the rate of contribution for members and employers* of the System." 3 V.I.C. § 718(a) (emphasis added). There is no antecedent confusion here either, just the Legislature's clear indication that pension entitlements be financed according to actuarial reserve requirements from inputs by all stakeholders and that the GERS Board actuarially determine both employee and employer contribution rates.

an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant provisions").

With the text of the statute offering little or no support for GERS's position, we ask why, if the Legislature sought to impose on the GVI a supervening obligation to fund GERS to actuarial soundness, it would have promulgated (and routinely amended) a detailed schedule of employee compensation percentages for the GVI to contribute? *See* 3 V.I.C. § 718(g). GERS tries to save the fixed-percentage scheme from superfluity by characterizing it as the employer's perennial default and the ADEC as the conditional obligation, triggered only when the fixed percentages underserve the system. Set aside the reality that the so-called conditional would have swallowed the default in each of the last 30-odd years—and thus that GERS's reading, like the GVI's, still casts the Legislature as Pollyanna. At bottom, GERS's conception conflicts with the statute's history. Recall that the 1959 legislation creating GERS established a fixed-percentage employee contribution but, though using similar actuarial reserve language, did not attach a percentage to the employer's contribution. From the beginning, "*[t]he amount of contributions by the employer* for the various purposes of the system *shall be determined by applying a percentage rate* to the aggregate compensation of the members for each regular payroll period." Act of June 24, 1959, No. 479, § 718, 1959 V.I. Sess. Laws 92, 111 (emphases added). Unsurprisingly, the Legislature amended the statute to announce just such a schedule of percentages that the GVI would need to contribute as employer. Act of Feb. 8, 1968, No. 2098, § 718(g), 1968 V.I. Sess. Laws, Pt. I, 9, 9 (defining first employer contribution window as "pay periods starting: before July 1, 1968"). The historical progression suggests that the Legislature enacted the fixed-percentage employer contri-

-57-

butions to instantiate the actuarial soundness requirement.[31] Nothing suggests that it ever sought to upend this consistent structure *sub silentio* by imposing a second, separate ADEC obligation.

GERS next argues that the consent judgment and, by implication, the Legislature could have used words such as "fixed" if it wished to cabin the employer's obligation to fixed-percentage contributions. But the establishment of a detailed schedule of percentages, without a comparable articulation of the GVI's potentially limitless mandate to fully fund GERS, militates against inferring any legislative intent to create the ADEC. Legislatures do not hide elephants in mouseholes. *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001). There is no provision for "actuarially determined employer contributions" in the statute—only sources of contributions that, "together," must provide an "actuarially determined reserve." *See, e.g.*, *Bates v. United States*, 522 U.S. 23, 29 (1997) (noting that courts "ordinarily resist reading words or elements into a statute that do not appear on its face"). In view of subsection (f) and the surrounding statutory landscape, any

---

[31] Unlike our dissenting colleague, we think it unremarkable that the Legislature struck from the 1968 version of section 718 the original provision that "the amount of contributions by the employer for the various purposes of the system shall be determined by applying a percentage rate to the aggregate compensation of the members." *See* Dissenting Op. at 26 & n.28. After all, in those same 1968 amendments, the Legislature *for the first time* fixed the employer's percentage rate to be applied to employees' aggregate compensation. Retaining the vestigial clause may well have caused confusion, or even engendered litigation, about whether there was an additional percentage that the GVI needed to contribute.

suggestion that judges or legislators should have added clarifying language to *exclude* reading in an ADEC obligation strikes us as fanciful.

To support postulating the ADEC, GERS points finally to section 718a, a provision enacted in 2006 to govern how GERS informs the GVI of needed appropriations. Section 718a provides for transmittal to the Legislature of the "actuarial valuation and appraisal" required by section 718, along with an "itemized estimate of the amounts necessary to be appropriated by the government to [GERS]." 3 V.I.C. § 718a(a). But the lack of an ADEC obligation does not mean that "Section 718a would have no reason to exist in the first place." Cross-Appellant's Reply Br. 8. Even to pay the biweekly contributions, the GVI needs to know approximately how much to appropriate annually for its GERS commitments. And missing from the detailed enumeration of elements required to be included in the appropriations estimate, *see* 3 V.I.C. § 718a(a)–(e), is any clear call for the information most critical to GERS's proffered ADEC: its projected commitments to pensioners for the fiscal year. We think it natural for the Legislature—one year after authorizing the GERS Board to determine and (apparently within limits) increase contribution rates—to enact a statute requiring detailed support for GERS's appropriations requests. All the more so given our plain reading of section 718(f), under which all stakeholders must ensure the pension system's actuarial soundness and rates must be calibrated to actuarial needs.

## B. GERS's Authorities

Nor do the cases GERS cites move the needle. Applying them here would assume the answer to the question presented: whether GERS's proffered ADEC obligation flows

from the text of section 718 or should somehow be implied based on the relevant milieu.

Start with GERS's leading case, *Louisiana Municipal Association v. State,* 893 So. 2d 809 (La. 2005). It dealt with statutes that unequivocally provide for *both* an employer contribution rate *and* an actuarially required employer contribution. *See id.* at 837–38; La. Stat. Ann. § 11:103(B)(1)–(3). By contrast, GERS's appeal requires us to determine whether the GVI has any such second obligation independent of the fixed-rate contributions set by statute.

GERS's other authorities involve pension regimes under which employees have percentage-based contribution obligations, but the contributions of the employer (*i.e.*, a state and its counties) are actuarially determined.[32] *See, e.g.*, *Hall v. Elected Officials' Ret. Plan*, 383 P.3d 1107, 1110–11 (Ariz. 2016) ("The employee contribution rate was set by statute initially at 6%, with the employer being responsible for contributing the remaining amount necessary to fund a defined benefit upon retirement." (citing Ariz. Rev. Stat. Ann. § 38-810(A) (1985))); *Kahoʻohanohano v. State*, 162 P.3d 696, 706 (Haw. 2007) ("Trustees engage an actuary to determine the employers' normal cost and accrued liability contributions for each fiscal year." (citations omitted)); Haw. Rev. Stat. Ann. § 88-45 (setting forth schedule of fixed-percentage contributions for employees); *Bd. of Trustees of Town of Lake Park Firefighters' Pension Plan v. Town of Lake Park*, 966 So.2d 448, 450 (Fla. Dist. Ct. App. 2007) (noting "mandatory five percent contribu-

---

[32] These cases, and most others that GERS relies on, decided constitutional challenges to legislation that effectively reduced the status quo of pension benefits. The posture of these cases limits their relevance to GERS's claim in this appeal.

tion or payment by each firefighter" and "a mandatory payment by the municipality of 'a sum equal to the normal cost of and the amount required to fund any actuarial deficiency shown by an actuarial valuation as provided in part VII of chapter 112'" (quoting Fla. Stat. § 175.091(1)(g)); *see also Wayne Cnty. Emps. Ret. Sys. v. Wayne Charter Cnty.*, 859 N.W.2d 678, 679 (Mich. 2014) ("Each year, the county is required by Const. 1963 art. 9, § 24, to make an 'annual required contribution' (ARC). An annual actuarial valuation determines the ARC amount." (citation omitted)); Mich. Compl. Laws Ann. § 38.1140m(1) ("The required employer contribution is the actuarially determined contribution amount."). These cases do not help us reconcile the "together" clause of section 718(f)— not to mention the first sentence of section 718(a)—with GERS's argument that, in fact, the actuarial funding responsibility lies solely with the GVI.[33]

Still other cases relate to state statutes that explicitly place the obligation on the employer to make up any shortfall. *See, e.g.*, *Booth v. Sims*, 456 S.E.2d 167 (W. Va. 1994); W. Va. Code § 5-10-31(b) ("[T]he participating public employers'

---

[33] The statutes at issue in one case that GERS invokes, *Hall*, 383 P.3d at 1110–11, arguably support our plain reading of section 718 in which the fixed-percentage contribution rates are themselves intended to be calibrated for actuarial soundness. *See* Ariz. Rev. Stat. Ann. § 38-810(C) ("[E]ach employer shall make contributions on a level percent of compensation basis for all employees . . . sufficient under the actuarial valuation to meet both the normal cost plus the actuarially determined amount required to amortize the unfunded accrued liability over a closed period . . . that is established by the board taking into account the recommendation of the plan's actuary . . . .").

contributions . . . shall be a percent of the members' total annual compensation . . . . equal to an amount which, if paid annually by the participating public employers, will be sufficient to provide for the total normal cost of the benefits expected to become payable to all members *and to amortize any unfunded liability found by application of the actuarial funding method*[.]" (emphasis added)).  And ERISA's "defined benefit plan" addresses a statutorily defined "asset pool" in which "the employer typically bears the entire investment risk and . . . must cover any underfunding as a result of a shortfall that may occur from the plan's investments." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439–40 (1999).

At best, the cases that GERS relies on take us no closer to answering whether section 718(f) obligates the GVI to fund GERS to actuarial soundness.  In fact, the specificity with which the regimes addressed in those cases articulate an employer's actuarially determined contribution or shortfall liability renders problematic the less concrete language in section 718(f).

## C. The Parties' Historical Understanding

Though there is no formal legislative history contemporaneous with the 1959 or 1968 laws enacting and amending the Retirement Code, subsequent testimony of GERS representatives to the Legislature undermines GERS's argument for the ADEC.  In an October 8, 1997 meeting of the Committee on Government Operations about a bill on allocating GERS's administrative expense, a representative of GERS testified to the Legislature that:

> [W]hat would happen in the future is that based
> on our requirement in the statute that the funding

of the system be computed on the actuarial reserve basis, we would then need to come back to the Legislature and report our latest findings in term[s] of the actuarial report and *recommend that some adjustment be made in the employer contribution and/or the employee contribution. That is basically the only way that the system can begin to address the underfunding.* . . . [T]he latest actuarial evaluation . . . determined that *an additional contribution totaling five—approximately, five and-a-half percent would be needed to be added to the current contribution rate formula* that we have in place.

Oct. 8, 1997 Gov't Ops. Comm. Hrg. Tr. 128:22–130:2 (emphases added). Increasing the fixed-percentage contributions of employees and employers was thus understood as "the only way that the system can begin to address" underfunding.[34]

Eight years later, in a September 12, 2005 session of the same committee, then-Acting Administrator and CFO of GERS, Willis Todmann, testified at a hearing on the 2005 amendments to identify "specific areas . . . where the most immediate action is needed." Hrg. Tr. 12:12–14. Also present

---

[34] Legislators appear to have shared this understanding. Trying to explain how GERS works, in the lead-up to passage of the 2005 bill, Senator Barshinger stated during debate that "[y]ou pay in and interests [*sic*] is made on the money you give in, and in fact *the government throws in an additional percentage, and that creates a pool of money for you.*" Sept. 26, 2005 Reg. Sess. (Part II) Hrg. Tr. 46:2–6 (emphasis added).

were a member of GERS's Board of Trustees and the Assistant GERS Administrator.  Todmann told the Committee:

> The System requires full autonomy to *incrementally set and adjust the contribution rates for the employer and employees as may be determined from the annual actuarial valuations. . . .* The various obligations of the System . . . are required to be financed in accordance with the actuarial reserve requirements from the contribution by members, contributions by the employer, interest income, and other income accruing to the System, but in reality, this does not occur because executive and the Legislature randomly determine when contributions are to be increased and how much those contributions should be.  Whenever a shortfall occurs in the income from investments and the contributions from the employer and employee, *the shortfall must be made up by the Plan Sponsor and member contributions to keep pace with the actuarial determinations* for the payment of future pension obligations. . . . Although *the statute does not provide for the proper actuarial funding of the System*, the G.E.R.S. has repeatedly requested that the Legislature enact such corrective measures. . . . The enabling Act failed to incorporate a proper funding plan because *it was the intention of the Legislature that the income generated from the investments and the contributions from the employer and employees will meet the funding needs* to pay the future pension benefit obligations. . . .  [W]hat is most needed to financially

-64-

reform the System is a corrective funding plan to provide for the annual actuarial funding of the shortfall in the cost of the System. . . . *The annual funding of the G.E.R.S. must be made a "statutory debt" through legislation.*

Sept. 12, 2005 Gov't Ops. Comm. Hrg. Tr. 13:14–17, 14:3–18, 15:3–6, 16:3–8, 17:11–20 (emphases added). Todmann's testimony shows that GERS understood the following: (a) shortfalls "must be made up by" the GVI and employees—rather than just the GVI via a supervening ADEC obligation; (b) the language in section 718(f) reflects the Legislature's "intention" that the fixed contribution rates would be adjusted to provide actuarial soundness; and (c) annual, actuarially required funding of GERS was *not* a "statutory debt" of the GVI. As Todmann and others advocated, the 2005 amendments recognized that "[t]he GERS Board of Trustees is the entity best suited to determine the actuarial level and to *fix appropriate contribution rates*, *commensurate with the future pension benefit obligations of the system.*" V.I. 26th Legis., Bill No. 26-0071, Bill Summary, Section 14 (emphasis added); *see* 3 V.I.C. § 718(a). But the 2005 bill neither altered the scope of the GVI's employer contributions in section 718 nor changed any of the language that GERS now invokes to charge the GVI with the ADEC obligation. Nor did its reforms address GERS's "unfunded liability." *See generally* Sept. 22, 2005 Hrg., V.I. Legislature, Committee on Rules and Judiciary.

Though legislative history contemporaneous with the public-pension system's enactment is unavailable, hearing transcripts from the 1990s and 2000s show that both GERS and the Legislature understood the GVI's employer contribution obligation as limited to fixed percentages of employee compensation. Motivating GERS's appeals to the Legislature was

-65-

a recognition that nothing imposed an additional statutory responsibility on the GVI to assure actuarially sound funding of GERS.

\* \* \*

Approaching a fiscal cliff, GERS now protests that it will devolve into a pay-as-you-go system by 2023 unless the GVI funds it in accordance with the ADEC (or somehow increases its current contribution rate of 20.5 percent to 68 percent). But these are fiscal policy arguments we cannot entertain. If new pension legislation is needed, as it may well be, such arguments should be made in an appeal to the Legislature. There is simply no compelling interpretation of the statute or any extrinsic evidence that can support reading into Virgin Islands law GERS's proffered ADEC obligation. We will thus affirm the District Court's entry of judgment to the GVI in GERS's cross-appeal.

## V.   CONCLUSION

Court battles, a consent judgment, settlement efforts, piecemeal legislative fixes, and entreaties to elected officials have animated GERS's 40-year campaign to secure actuarial soundness. But its successes have been qualified in large part by the limitations of the territorial law establishing the public-pension system. And so it goes in this appeal. Our ruling preserves an award of $18.9 million in principal, $6.1 million in interest and fees, and what will be additional millions in enhancements for GERS. But we take off the table tens of millions of dollars in enhancements that were awarded to GERS under an unsupportable retroactive application of Virgin Islands law. We have no doubt that GERS needs more—possibly billions more—to fend off insolvency. But as mem-

bers of the Third Branch, we can neither write legislation nor levy taxes.  And we are powerless to re-write imperfect but unambiguous statutes even if doing so would make them better serve the needs of their intended beneficiaries.

Respecting the judiciary's role in our Republic, we in turn expect the GVI to satisfy the judgment of the District Court.[35]  We are optimistic that all stakeholders will cooperate

[35] Our colleague, concurring in part, takes care to emphasize that, in affirming in part the April 3, 2020 order of the District Court, we hold only "that the GVI is liable for the obligations in the Consent Judgment" and do not "order[] the GVI to disburse monies from the Virgin Islands' treasury."  Concurring Op. at 9.  And who would disagree that the Legislature's power of the purse is a pillar of the separation of powers and that the judiciary must respect the Legislature's chosen mechanisms for making appropriations?  *See generally* 33 V.I.C. §§ 3101 (prohibiting GVI officers and employees from entering into contracts and obligations on behalf of GVI without an appropriation in advance "unless such contract or obligation is authorized by law"), 3106(a) (allowing designated officers of the GVI to exempt certain funds from apportionment); Act of Sept. 29, 2020, No. 8365 (appropriating $350,000 in fiscal year 2021 for judgments greater than $25,000).  Yet we must bear in mind that the GVI did not challenge the underlying order—the 1984 consent judgment—as invalid for lack of an appropriation prior to appealing the District Court's enforcement order.  *See United States v. Gov't of V.I.*, 363 F.3d 276, 291–92 (3d Cir. 2004) (affirming in part enforcement order against GVI, despite argument that district court lacked power to enter underlying order obligating GVI to pay funds without an appropriation, because GVI never challenged propriety of underlying order).

in good faith to avert the looming insolvency of GERS.  No opinion of ours could make, or even make easier, the hard choices that now confront the United States Virgin Islands and GERS.  But our decision definitively underscores the need for pension reform and adequate funding legislation.  Hopefully, greater accountability in the shared interests of protecting the deferred compensation of pensioners and the economy of the Islands will carry the day.

*Government Employees Retirement System of the Virgin Islands v. Government of the Virgin Islands*, Nos. 20-1749 & 20-1766

---

MATEY, *Circuit Judge*, concurring in part and dissenting in part.

Much about this appeal is a familiar story. Like many of our institutions, public pensions date to the Roman Empire, arriving in our new Republic as a comforting promise to injured patriots fighting in the Revolution.[1] Military pensions paved the way for civilian plans, with Massachusetts creating the first public employee retirement system in 1911.[2] Other states joined the rush[3] and, soon enough, state and local

---

[1] *See* Robert L. Clark, Lee A. Craig & Jack Wilson, A History of Public Sector Pensions in the United States, at 1–3 (2003). In 1832, Revolutionary War pensions extended to those with at least six months of wartime service. *See* Theodore J. Crackel, *Revolutionary War Pension Records and Patterns of American Mobility, 1780–1830*, 16 Prologue 3 (Fall 1984), https://www.archives.gov/publications/prologue/1984/fall/pension-mobility.html.

[2] Clark et al., *supra* note 1, at 4.

[3] There are currently over 3,400 state and local pension systems in the United States, covering more than 27 million members and beneficiaries. U.S. Gov't Accountability Office, GAO-12-322, *State and Local Government Pension Plans: Economic Downturn Spurs Efforts to Address Costs and Sustainability* 4 (2012), https://www.gao.gov/assets/590/589043.pdf.

pensions became an entitlement of public service.[4] But like many entitlements, pension promises prove hard to keep as lessons hard learned in antiquity[5] are ignored or, perhaps, wished away.[6] Pensions, of course, are guarantees of future income. Funding the benefits due tomorrow means taking prudent fiscal steps today, and every year, for as long as those generous sums remain due.

---

[4] Clark et al., *supra* note 1, at 5. *See also* Terrance O'Reilly*, A Public Pensions Bailout: Economics and Law*, 48 U. Mich. J. L. Reform 183, 184 (2014) ("The traditional compensation for [a career as a public school teacher, police officer, or firefighter] includes . . . relatively comfortable retirement benefits.").

[5] *See* Clark et al., *supra* note 1, at 1 (observing that "the fall of the Roman republic and the rise of the empire were inextricably linked to the payment, or rather nonpayment, of military pensions").

[6] Thinking dominated by "overoptimistic investment return assumptions" cannot meet the "the rising cost of state and local government employee retirement plans." Andrew Biggs, *Can States Afford Rising Public Pension Debts?*, Forbes (Jul. 28, 2020), https://www.forbes.com/sites/andrewbiggs/2020/07/28/can-states-afford-rising-public-pension-debts/?sh=697c744b97ee; *see also* Mary Williams Walsh & Danny Hakim, *Public Pensions Faulted for Bets on Rosy Returns*, N.Y. Times (May 27, 2012), https://www.nytimes.com/2012/05/28/nyregion/fragile-calculus-in-plans-to-fix-pension-systems.html (explaining the effects of overestimating projected rates of return).

But across the country, this has not happened. Economists glumly estimate that state pensions combined hold unfunded liabilities between $700 billion and $4.6 trillion.[7] Like a game of dominos, substantial benefits[8] connect to ever

[7] T. Leigh Anenson, Alex Slabaugh & Karen Eilers Lahey, *Reforming Public Pensions*, 33 Yale L. & Pol'y Rev. 1, 5 (2014). Underfunding for public school pensions alone tops $900 billion. *Id*.

[8] James Farrell and Daniel Shoag, *Risky Choices: Simulating Public Funding Stress with Realistic Shocks*, Brookings Inst. (Nov. 30, 2017), https://www.brookings.edu/research/risky-choices-simulating-public-pension-funding-stress-with-realistic-shocks/ ("Another shortcoming with the existing debate is that models used by both academics and practitioners generally assume that state and local governments will indeed fund the promises they make. In practice, of course, governments often fail to come up with the money they 'should' contribute according to their funding laws."); Rachel Greszler, *Too-Good-to-be-True Pensions Face Massive Shortfall*, Heritage Found. (May 30, 2017), https://www.heritage.org/taxes/commentary/too-good-be-true-pensions-face-massive-shortfall ("For many Americans, defined benefit pensions have been a dream come true. After a few decades of labor, they've retired in their 50s or early 60s with a comfortable pension income for life. But that dream come true is too good to last."); Andrew G. Biggs, *Not So Modest: Pension Benefits for Full-Career State Government Employees*, Am. Enter. Inst. 3 (Mar. 2014), https://www.aei.org/wp-content/uploads/2014/03/-aei-economic-perspective-march-

more funding from public coffers already spread too thin on a host of other priorities.[9] So even when hindsight highlights the obvious dilemma, it is nearly impossible to get back into the

2014_160053300510.pdf?x91208 ("[M]any state retirement systems produce what might be called 'pension millionaires'— that is, employees who will receive more than $1 million in lifetime retirement benefits.").

[9] Naturally, the pull of pension costs necessarily "can squeeze out other important parts of state and local budgets." Andrew G. Biggs, *Have Public Employee Pensions Become More Generous, or less?*, Forbes (Aug. 15, 2018), https://www.forbes.com/sites/andrewbiggs/2018/08/14/have-public-employee-pensions-become-more-generous-or-less/?sh=633e4df11e20.

black.[10] Small wonder scholars have called the public pension crisis a "ticking time bomb."[11]

---

[10] *See* Monahan, *supra* note 7, at 123 ("A plan that has an unfunded liability must eventually make up that funding shortfall if it is to pay promised benefits. And the larger a plan's unfunded liability the larger its annually required contributions will be."); O'Reilly, *supra* note 4, at 186 ("Once a pension plan exhausts its reserves, it faces the same dilemma year after year simply to stay even: attempting to fund current retiree benefits out of cash flow while still setting aside adequate funds for the accruing benefits of current employees."); *see also* O. Emre Ergungor, *When States Default: Lessons from Law and History,* 2017-16 Economic Commentary, at 1 (Fed. Reserve Bank of Cleveland, Oct. 2017), https://www.clevelandfed.org/newsroom-and-events /publications/economic-commentary/2017-economic-commentaries/ec-201716-pensions-when-states-default.aspx ("The dire state of public pensions increases the likelihood that, at some point in the future, retirees may find themselves competing with other stakeholders for the same tax dollars in the appropriations process. Bondholders will also insist on being repaid, and residents will still need roads, sewers, water, and education.").

[11] Anenson et al., *supra* note 7, at 11 n.45. Other dire forecasts warn of the "coming pension implosion" resulting from pension plans that were "built on a vision of corporate America where unchanging industries [had] lifetime employees" and established by laws that "are not only anachronistic, but unstable." David John, Rea Hederman & Tim Kane, *Are Pensions the Next Fiscal Crisis?*, Heritage

All this to say, the facts underlying this case are not unique. This is not a problem specific to the Virgin Islands and GERS. Some cite the aspirational qualities of these promises, questioning how strained governmental budgets can bear lavish subsidies for retirees.[12] Others blame the ballooning

---

Found. (June 7, 2005), https://www.heritage.org/social-security/report/are-pensions-the-next-fiscal-crisis. *See also* Erick M. Elder & Gary Wagner, *Can Public Pensions Fulfill Their Promises?*, at 3 (George Mason Univ. Mercatus Ctr., Working Paper, Apr. 2015), https://www.mercatus.org/system/files/Elder-PA-Public-Pensions.pdf (referring to the pension funding situation in Pennsylvania as a "time bomb"); William G. Gale and Aaron Krupkin, *Financing State and Local Pension Obligations: Issues and Options*, Brookings Inst., at 1 (Jul. 2016), https://www.brookings.edu/wp-content/uploads/2016/07/Financing-State-and-Local-Pension-Obligations-Gale-Krupkin-1.pdf ("Many states and municipalities are struggling to fund defined benefit pension plans for their employees. . . [A]lmost every state [has] implemented some combination of lower benefit accruals and higher employer or employee contributions."). The coronavirus pandemic has exacerbated the public pension crisis. Mary Williams Walsh, *Coronavirus is Making the Public Pension Crisis Even Worse*, N.Y. Times (Apr. 2, 2020), https://www.nytimes.com/2020/04/02/business/coronavirus-public-pension.html.

[12] In 2018, state and local pensions incurred new liabilities and servicing costs of $345 billion, while receiving only $151 billion of public funding. Andrew G. Biggs, *Can States Afford Rising Public Pension Debts?*, Forbes (Jul. 28,

costs of all entitlements.[13] Several have reflected on how elected officials choose to offer ever-greater benefits and then, "maddeningly, [] choose not to fund public pensions as they are required."[14] But none have suggested an Article III court can resolve the issue. Nor have any courts tried, until today.

2020), https://www.forbes.com/sites/andrewbiggs/2020/07/28/can-states-afford-rising-public-pension-debts/?sh=4e5c612897ee.

[13] *See* Brian M. Riedl, *Deficit Reduction Requires Major Entitlement Reform*, Heritage Found. (May 18, 2011), https://www.heritage.org/budget-and-spending /commentary/deficit-reduction-requires-major-entitlement-reform ("Driven by entitlement costs, the national debt is set to reach cataclysmic levels."); Robert E. Moffit, *Price rises every day without entitlement reform*, Heritage Found. (June 14, 2006), https://www.heritage.org/health-care-reform/commentary/price-rises-every-day-without-entitlement-reform (observing that we are in "a time when entitlement costs already are growing much more rapidly than the tax receipts that are supposed to pay for them").

[14] Paul M. Secunda, *Litigating for the Future of Public Pensions*, 2014 Mich. St. L. Rev. 1353, 1374 (2014); *see also* Frederick M. Hess & Juliet P. Squire, *"But the Pension Fund Was Just* Sitting *There. . ." The Politics of Teacher Retirement Plans*, 5:4 Education Finance and Policy 587, 588 (MIT Press, 2010) ("For public pension funds, including those that cover teachers, the primary safeguard is the self-discipline of public officials and the hope that they will not be unduly tempted by short-term electoral considerations and influential constituencies. Given the state of public pension funds, these safeguards hardly seem adequate.").

I am skeptical. In one sense, the dispute unfolds like a common law contract problem, asking the Court to merely determine the best meaning of an agreement. Viewed through that lens, I agree with much of the Court's reasoning in Part III.A holding the Consent Judgment obligates the GVI for outstanding contributions under Section 718(g). Likewise, I agree with the analysis in Part III.B reasoning that interest and penalties cannot be read into the Consent Judgment retroactively.[15] Indeed, as a matter of interpretation, I would go

---

[15] I do not see a need to consult the lack of legislative history to resolve "whether the *statutory text* . . . manifests an intent" to apply retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994) (emphasis added); *see also I.N.S. v. St. Cyr*, 533 U.S. 289, 316 (2001) ("The standard for finding [ ] unambiguous direction" in the first *Landgraf* step "is a demanding one"), *superseded by statute*, REAL ID Act of 2005, Pub. L. No. 109–13, 119 Stat. 310, *as recognized in Nasrallah v. Barr*, 140 S. Ct. 1693 (2020); *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 459 (4th Cir. 2011) (interpreting the "demanding" first *Landgraf* step as "requiring prescription that is truly express and unequivocal") (citing *St. Cyr*, 533 U.S. at 316) (internal citation omitted). I recognize that when the statute is silent on retroactivity, courts have sometimes looked to legislative history. But "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020). As a result, "legislative history can never defeat unambiguous statutory text," particularly when it does not exist. *Id*. at 1750; *see also Arevalo v. Ashcroft*, 344 F.3d 1, 12

---

8

further and conclude the Consent Judgment imposes *additional* obligations on the GVI under Title 3 V.I.C. § 718(f), because GVI's responsibility to pay "employer contributions" in Section 718 includes the "employer contributions" required by Section 718(f). If that were the scope of our decision, if this were just two parties asking a court to figure out who owes what, few would find the opinion today noteworthy.

But we are writing on a far bigger stage, one that, I fear, will rightly draw the attention of governors and the governed across the country. If they interpret our decision to mean that the Article III judicial power comprehends a monetary award to pay a general statutory obligation, whether or not the separate sovereign has appropriated funds, a new and dangerous chapter in the pension wars will open.

So I write separately to emphasize the narrower scope of the Court's holding affirming only that the GVI is liable for the obligations in the Consent Judgment. But in doing so, the Court is not ordering the GVI to disburse monies from the Virgin Islands' treasury. And that is because the federal courts almost always lack that authority. We stand, it seems, dangerously close to the Constitutional precipice. The parties need not return and ask us to step off.

## I. THE CONSENT JUDGMENT

---

(1st Cir. 2003) ("At most, legislative histories of this type tell us that while Congress may have thought retroactivity to be an important topic, it could not muster a clear consensus on the subject.") (citing *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 309 (1994)). For that reason, I see no need to note its absence here.

GERS's cross-appeal requires examining the ordinary understandings of an agreement. I begin with the small dispute over the best reading of the Consent Judgment. And the principles guiding that analysis—defining the words using their common meaning when drafted—informs the larger dispute over the best reading of Article III. It is a puzzle with only two pieces, both turning on the same questions of interpretation.

## A.     The Consent Judgment Encompasses Section 718(f)

Start with the consent judgment, an instrument with "attributes of both contracts and injunctions." *E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 192 (3d Cir. 2020). Sometimes a consent decree imposes a correction, coercing compliance, handing out punishment, prohibiting future wrongs. That side of the coin matches the power of an injunction. *Id.* But "when a party seeks not to punish but to enforce the other party's commitments," like GERS here, the consent judgment "works more like a contract." *Id.* So the Consent Judgment "is to be construed basically as a contract," *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975), with traditional principles of interpretation informing the terms. *Flemming ex rel. Estate of Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 289 (3d Cir. 2002).

Interpretation of any text turns, of course, on the text. *Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998) ("It is axiomatic that where the language of a contract is clear and unambiguous, it must be given its plain meaning.") (citing Restatement (Second) of Contracts § 202(3)(a) (1981)); *see also In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab.*

10

*Litig.*, 706 F.3d 217, 223 (3d Cir. 2013) ("When the terms of a contract are clear and unambiguous, its meaning must be determined from the four corners of the contract." (internal citation and quotation marks omitted)). If needed, we can aid that effort by looking at documents "expressly incorporated in the decree." *ITT Cont'l*, 420 U.S. at 238. These principles lead me to conclude that the Consent Judgment includes the GVI's obligations under Title 3 V.I.C. § 718(f), what GERS calls the "actuarially determined employer contribution" or "ADEC." Appellee's Br. at 53.

Here is why. The Consent Judgment tells the GVI to timely pay "the total amount due of . . . employer contributions as defined in Title 3, Section 718." JA113–14. Naturally, that includes all of Section 718, from (a) to (g). So if Section 718(f) is an "employer contribution," the GVI pays that amount. Section 718 does not explicitly spell out what is, or is not, an "employer contribution." Indeed, that phrase does not appear anywhere in Section 718. But we have plenty of other help.

Section 718(a) explains who funds GERS: its members, the "employer," and "interest income." Section 718 also details what "contributions" the "employer" makes. For example, Section 718(g) says the "employer shall contribute" a fixed percentage of GVI employee salaries. Likewise, Section 718(k) says the "employer shall . . . contribute to the System" costs of "any special early retirement program." 3 V.I.C. § 718(k) (1995).[16] All of which inform the best reading of the

---

[16] As is often the case in a decades-old dispute, the locations of these provisions have moved around. Codification of the quoted version of Section 718(k) occurred in 1994. Act

11

similar wording in Section 718(f) that the "employer shall make contributions" to finance the fund's actuarially determined reserve.

Taken together, there is nothing in Section 718 suggesting that one particular subsection defines "employer contributions," or that Section 718(f) does not. Or, as we have noted, the same words or phrases in different parts of the same statute have the same meaning unless there is "such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Cf. Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (en banc) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The Consent Judgment reflects that structure, incorporating *all* of the "employer contributions . . . defined in Title 3, Section 718" and thus the "employer . . . contribution" in Section 718(f) as well as the "employer . . . contribut[ions]" in Section 718(g). That excludes a reading that places Section 718(g), but not Section 718(f), into the Consent Decree. *See* 11 Williston on Contracts § 30:25 (4th ed. 2020) ("When a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and . . . [t]he incorporated

---

of Aug. 26, 1994, No. 6007, § 8(c), 1994 V.I. Sess. Laws 150, 158. A later reorganization moved this section into the current Section 718(j), 3 V.I.C. § 718(j) (2021), and Section 718(k) now addresses the timing and prioritization of the employer's funding of early retirement programs. *See* V.I.C. § 718(k) (2021); Act of Nov. 2, 2005, No. 6794, § 14.4, 2005 V.I. Sess. Laws 380, 396.

12

matter is to be interpreted as part of the writing."); *see also* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (stating general terms "are to be accorded their full and fair scope" and "are not to be arbitrarily limited").

The District Court saw a flaw in this design. At the time of the Consent Judgment, the ADEC obligation flowed from an annual calculation. *See* § 718(e) (1968).[17] In contrast, the Consent Judgment requires payments every pay period. That, the District Court held, makes an ADEC obligation under Section 718(f) impossible. But two obstacles hinder that reading. First, that is not what the Consent Judgment says. And we are not free to reorganize, rewrite, or restate the parties' clearly expressed intentions.

Second, even if it did, that does not read out the obligation of Section 718(f) because nothing prevents a *pro rata* ADEC payment every pay period after calculation. Indeed, that is the process used for all employer and employee contributions. *See* 3 V.I.C. § 718(h) (1968) ("[E]mployer and employee contributions shall be paid into the system each payroll period"), *amended*, Nov. 2, 2005, No. 6794, § 14.3, 2005 V.I. Sess. Laws 380, 397 ("[E]mployer and employee contributions must be paid to the system within ten days after the closing of each payroll period."); 3 V.I.C. § 718(h) (2021) ("[E]mployer and employee contributions shall be paid to the System within ten working days after the pay date."). In other words, even if we accept the District Court's premise that the

---

[17] Section 718(e) currently requires a "bi-annual[]" computation. Act of Oct. 26, 2015, No. 7802, § 2(f), 2015 V.I. Sess. Laws 147, 155; *see* 3 V.I.C. § 718(e) (2021).

13

Consent Judgment only encompasses regular pay period obligations, that still includes the regular *pro rata* contributions under Section 718(f) each pay period.

**B.     Section 718(f) Obligates the GVI to Contribute the ADEC**

For these reasons, I read the Consent Judgment to include "employer contributions" required by Section 718(f), a conclusion the majority shares. We differ only in defining what Section 718(f) requires. Here again our task is interpretation, not invention. As always, we employ the "fundamental canon of statutory construction" requiring that we "interpret the words consistent with their ordinary meaning" when enacted. *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070, 2074 (2018) (internal quotation marks omitted); *see also United States v. Johnman*, 948 F.3d 612, 617 (3d Cir. 2020). "It is a focused inquiry and '[o]ur analysis begins and ends with the text.'" *United States v. Smukler*, --- F.3d ----, No. 19-2151, 2021 WL 1056021, at *6 (3d Cir. 2021) (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020)). We tackle the task of interpretation using our "toolkit" with "all the standard tools of interpretation" used to "carefully consider the text, structure, history, and purpose" of the statute. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019) (cleaned up). With that aim, we seek not a perfect answer on meaning, for one does not exist, but to "'reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (quoting *Kisor*, 139 S. Ct. at 2448 (Kavanaugh, J., concurring in the judgment)). Using that inquiry, I believe the best meaning of Section 718(f) obligates a GVI contribution

14

separate from its fixed-percentage obligations in Section 718(g) sufficient to fund an "actuarially determined" reserve.[18]

The majority reaches for a different set of tools and, as a result, reads Section 718(f) to merely preview the employer's fixed percentage obligation in Section 718(g). An obligation, they write, to provide no more than "the fixed-percentage contributions of employees and employers to be calibrated to account for the changing actuarial needs of the system." Maj. Op. at 53. But those conclusions do not flow from the text of the statute. Rather, they emerge first from what the statute does not say (based on language deleted in 1968), and second, the testimony of GERS representatives in legislative hearings decades after the statute's enactment. Respectfully, I disagree with both that reasoning and result.

### 1. Section 718 Requires An Adequately Funded Actuarial Reserve

Before explaining why, let me note our broad areas of agreement. For one, none dispute that Section 718 requires actuarial soundness. That is plain from Section 718(a) requiring that the "obligations of the System shall be financed in accordance with actuarial reserve requirements[.]" 3 V.I.C. § 718(a). As both commonly and technically[19] understood when enacted, a pension plan with a "fully funded" "actuarial

---

[18] To be sure, the question of what the statute requires is separate from whether this Court has the power to enforce such requirements, a question addressed below.

[19] *See Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) (explaining "the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply").

15

reserve" is one in which the "reserve['s] assets" have met the "actuarially determined obligation accrued." Dorrance C. Bronson, *Pension Plans – The Concept of Actuarial Soundness*, 20-1 J. of the Amer. Ass'n of Univ. Tchrs. of Ins. 36, 37 (Mar. 1953); *see also Actuarially Sound Retirement System*, Black's Law Dictionary (11th ed. 2019) (defined since 1947 as "[a] retirement plan that contains sufficient funds to pay future obligations, as by receiving contributions from employees and the employer to be invested in accounts to pay future benefits").[20] Using that meaning, Section 718(f) requires the "actuarially determined reserve" to "provide . . . for the annuities and benefits" of the System. 3 V.I.C. § 718(f) (1968). And the "actuarial reserve" contemplated by Section 718 is a pool of assets sufficient to satisfy its liabilities to future retirees. In the parlance of private pensions, this is a "defined benefit" plan—a "general pool of assets" entitling beneficiaries to "a fixed periodic payment"—rather than a defined contribution plan in which "the employer's contribution is

---

[20] *Accord* Newton L. Bowers, Jr., *An Approximation to the Distribution of Annuity Costs*, 19 Transactions of Soc'y of Actuaries 295, 306 (1967) (defining a pension plan's "actuarial reserve" as "the expected value of future annuity payments."); James A. Graaskamp, *Implications of Vested Benefits in Private Pension Plans: Comment*, 33 J. of Risk and Ins. 489, 493 (Sep. 1966) (describing "present actuarial reserve formulas" in pension plans as requiring "pay[ing] both vested and unvested, earned and unearned benefits"); Phelim Boyle & Mary Hardy, *Guaranteed Annuity Options*, 33 Astin Bulletin 125, 129 (2003) (describing the "traditional actuarial reserving method" as "set[ting] aside additional capital to ensure that the liabilities under the guarantee will be covered with a high probability").

fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999) (internal citations omitted).

So too, all agree that Section 718(f) demands that GERS's "actuarially determined reserve" receive "adequate" funding. No mysterious meaning here. Then, as now, the ordinary meaning of "adequate" in a quantitative context means "equal to what is required." *Adequate*, Black's Law Dictionary (4th ed. 1968); *see also* "adequate, adj." *OED Online*, Oxford University Press, March 2021, www.oed.com/view/Entry/2299 (last visited April 6, 2021) ("Fully satisfying what is required; quite sufficient, suitable, or acceptable in quality or quantity."). In other words, Section 718(f)'s "adequate" modifier does not disturb what is otherwise clear from Section 718: that a particular funding quantum must satisfy the System's future outputs: the members' "annuities" and "benefits."[21] Finally, we reach the same conclusion that the fixed-percentage calibrations in Section 718(b) and Section 718(g) have not, and will not, achieve actuarial soundness. They are not, in other words, adequate. As history and math both prove, when the "actuarially determined reserve" exceeds the sum of those fixed-percentage contributions (plus income), the reserve cannot achieve "adequa[cy]." 3 V.I.C. § 718(f).

---

[21] And, since 1998, administrative costs. *See* Act No. 5223, §§ 1–2, 1998 V.I. Sess. Laws 234, 234–35 (deleting then Section 718(i) requiring the GVI to fund the system's administrative costs and folding that obligation into Section 718(f).)

17

## 2. The GVI Must Ensure Adequacy

Here is where I depart from the majority. Accepting that (a) the System must fund an actuarially sound reserve, and (b) arithmetic renders that impossible from fixed-percentage contributions alone, then something must make up that difference. The majority calculates differently, reading Section 718(f) to preclude what Section 718 otherwise requires, thereby baking a funding shortfall into the statute. In a bit of self-sabotage, the argument goes, the Legislature really meant to incentivize all to do more by creating a hard-capped contribution system regularly "[re-]calibrated" to "account for the changing actuarial needs of the system." Maj. Op. at 53.[22] And I admit, that seems like a good way to marshal the public and political pressure needed to turn aspirations into action. Pay as you go, or face a shortfall sure to shorten the terms of those tasked with finding needed funds. Except that is not what

---

[22] The majority recognizes that the fixed-percentage contributions in Sections 718(b) & (g) "have *not* been accurately calibrated to the actuarial needs of the system." Maj. Op. at 54. So if the "actuarially determined reserve" exceeds the sum of those fixed-percentage contributions (plus interest), the reserve cannot achieve "adequa[cy]." 3 V.I.C. § 718(f).

Even so, the majority asserts that Section 718 does not "*ensure* a shortfall" because the statute can always be amended. Maj. Op. at n.29. That seems to summarize the problem. For to read a law to require, by design, other legislation to accomplish its objective is "so startling" that it is unlikely to represent the best reading. *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 n.4 (2002) (Scalia, J., dissenting).

the statute says, a point, as we will see, the majority does not dispute.

Turn back to the text. As of the Consent Decree, Section 718(f) read:

> The employer shall make contributions which together with the members' contributions and the income of the system will be sufficient to provide adequate actuarially determined reserve for the annuities and benefits herein prescribed.

3 V.I.C. § 718(f) (1968).[23] As ordinarily understood, it is "the employer" who "shall" contribute what is needed for actuarial soundness. That is because the rule of last antecedent "provides that a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 136 S. Ct. 958, 962–63 (2016) (internal quotation marks omitted); *see also* Scalia & Garner, Reading Law 144. Here, the limiting phrase "shall make contributions" modifies the noun it immediately follows: "employer." 3 V.I.C. § 718(f).

Section 718(b) confirms that reading, requiring that "[e]ach employee who is a member of the system shall contribute" a fixed percentage of compensation. 3 V.I.C. §

---

[23] Later tweaks to this provision did not affect the operative language. *See* 3 V.I.C. §718(f) (2021) (now also requiring the "reserve" to cover the System's "administration" costs); *see* Act No. 5223 §§ 1–2, 1998 V.I. Sess. Laws at 234–35.

718(b) (1968)[24] (emphasis added). Section 718(b)'s command phrase gives meaning to Section 718(f)'s application of the "shall contribute" modifier to "employers" but not "members." *See Madar v. United States Citizenship & Immigration Servs.*, 918 F.3d 120, 123 (3d Cir. 2019) ("Under the interpretive canon *expressio unius est exclusio alterius*, we presume that '[t]he expression of one thing implies the exclusion of others.'") (quoting Scalia & Garner, Reading Law 107).

The majority agrees this is the natural way to read the text, but reasons that because Section 718(f)'s employer contributions occur "together with" employee contributions and the System's income, and because Section 718(a) "equaliz[es] the input of *all stakeholders* to the actuarial soundness of the system," Section 718(f) must merely repeat Section 718(a) and preview Section 718(g). Maj. Op. at 55–56 & n.30.[25] Not so.

---

[24] The legislature has amended Section 718(b)'s fixed-percentage contribution provision from time to time, but not this obligating phrase. *See* 3 V.I.C. § 718(b) (2021) ("Each employee who is a member of the Government Employees Retirement System shall contribute a percentage of compensation" at the enumerated rate).

[25] The majority argues that the "structure" and "sequen[ce]" of Section 718 are best understood to mean Section 718(a) supplies Section 718(f)'s meaning. Maj. Op. at n.30, citing *Pac. Emplrs. Ins. Co. v. Global Reins. Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012). I do not see how. Section 718(a) explains who funds the system; Sections 718(b)–(d) explain what the members contribute and how;

20

First, Section 718(f) forecloses that reading. Accepting the majority's interpretation that all three components—employer contributions, member contributions, and income—share Section 718(f)'s burden requires applying "shall make contributions" to "words or phrases more remote"—in this case, "members' contributions and income from the system." *See Rule of the Last Antecedent*, Black's Law Dictionary (11th ed. 2019). That is precisely what the rule of last antecedent counsels against. *Id.*; *see also Nearest-Reasonable-Referent Canon*, Black's Law Dictionary (a "postpositive modifier" including "adverbial or adjectival phrases" will "normally appl[y] only to the nearest reasonable referent"); *Lockhart*, 136 S. Ct. at 963 (declining to depart from the rule where it would

Section 718(e) requires the actuarial computation; and Sections 718(f)–(k) detail the amount and method of the GVI's contributions. *See* 3 V.I.C. § 718 (2021). If we can glean anything from "considering every provision of the [section] and how they fit together," *Pac. Emplrs.*, 693 F.3d at 430, it is that Sections 718(a) and (f) play distinct roles in the statutory scheme.

The majority also reads the modifications to Section 718(a) requiring the GERS Board to "actuarially determine the rate of contribution for members and employers," 3 V.I.C. § 718(a) (2021), as a "clear indication" that actuarial funding comes only from the fixed percentage contributions in Section 718(b) and (g). Maj. Op. at n.30. Of course, that language was not in Section 718(a) as adopted in the Consent Decree in 1984. Act of Feb. 8, 1968, No. 2098, § 1, 1968 V.I. Sess. Laws, Pt. I, 9–10. And it does not change the fact that when those fixed percentage contributions fall short "for whatever reason," Maj. Op. at 54, the system suffers a funding gap that only Section 718(f) can fill.

21

be "a heavy lift to carry the modifier" across entire preceding list of nouns). Nor does the result—compelling "income from the system" to "make contributions" to the systems—flow naturally. Applying the rule of the last antecedent avoids that trouble, and "reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Lockhart*, 136 S. Ct. at 963.

Second, nothing in the broader statutory landscape supports an interpretation of Section 718(a) as "equalizing" the responsibility for funding the System. Maj. Op. at 56. Section 718(a) says nothing about the allocation of funding responsibilities, much less that it must be equal. Nor does Section 718(f)'s directive that the various system inputs must "together" provide the actuarial reserve. Just because $W + X + Y = Z$ does not mean $W = X$ or $W = Y$.

Indeed, if the statute tells us anything about allocation, it is that the GVI bears the laboring oar. As first enacted, the statute created a fixed "4 per cent" employee contribution and a variable employer rate. *See* 3 V.I.C. § 718 paras. 2, 5 (1959). A 1968 amendment added a fixed-percentage employer contribution in Section 718(g) exceeding the employee rates in Section 718(b). *See* Act of Feb. 8, 1968, No. 2098, § 1, 1968 V.I. Sess. Laws, Pt. I, 9–10 (enumerating member and employer contribution rates in §§ 718(b) and (g), respectively). Since July 1, 1968, the GVI's contribution required by Section 718(g) has always exceeded the contemporaneous contribution required from members under Section 718(b).[26] That lopsided

---

[26] *See* Act of Apr. 23, 1970, No. 2700, § 12, 1970 V.I. Sess. Laws 73, 82–83; Act of July 8, 1974, No. 3593, § 3, 1974

22

responsibility grew in 2005, when another amendment prohibited the GERS Trustees from increasing employee contribution "rates" more than 3.0% over a five-year period. Act of Nov. 2, 2005, No. 6794, § 14.2, 2005 V.I. Sess. Laws 380, 396–97. Section 718(g), by contrast, has never had a comparable rate increase cap. *See* 3 V.I.C. § 718(g) (2021).[27] And the GVI, not the members, has always borne responsibility for covering administrative costs. *Id.* § 718, para. 6 (1959); *id.* § 718(i) (1968); *id.* § 718(f) (2021).

This is all to say that there is nothing "contradict[ory]" in reading Section 718(f) as elevating the GVI's financing responsibility. Maj. Op. at 56. Quite the contrary. Doing so gives meaning, rather than superfluity, to Section 718(f), consistent with "the larger statutory landscape[.]" *Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718, 1722 (2017); Scalia & Garner, Reading Law 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously").

### 3. Section 718(f) Requires the ADEC

So what is the GVI's responsibility, exactly? To "make contributions" that are "sufficient to provide adequate

---

V.I. Sess. Laws 189, 190; Act of March 15, 1990, No. 5522, § 1(xii)–(xiii), 1990 V.I. Sess. Laws 34, 37–38; Act of Apr. 12, 2008, No. 6992, §1, 2008 V.I. Sess. Laws 14, 15.

[27] This does not mean that the statute empowers the GERS Board to unilaterally increase the GVI's rates in Section 718(g) to achieve actuarial soundness. Maj. Op. at n.29. Indeed, as the majority observes, it is GERS's inability to do so that arguably makes its cross-appeal justiciable in the first place. Maj. Op. at n.4.

actuarially determined reserve" for the system. 3 V.I.C. § 718(f). But not, as the majority suggests, exclusively through the fixed-percentage contributions enumerated in Section 718(g). Section 718(f) must require a separate contribution from its fixed-percentage contributions in Section 718(g). If we are to give effect to Section 718's unambiguous requirement that the system maintain an actuarially sound reserve, Section 718(f) must cover what the fixed-percentage contributions and interest income do not. Otherwise, we would not only need to "treat [Section 718(f)] as stray marks on a page—notations that [the Legislature] regrettably made but did not really intend." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (internal quotation marks omitted). We would also ignore the "presumption against ineffectiveness—the idea that Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring).

Taken together, I cannot adopt an interpretation of the "Finance" Section of the GERS statute that does not finance GERS.

### 4. The Majority's Reasoning

The majority offers two responses to this reading. First, if Section 718(f) required the GVI to make the ADEC contribution, Section 718(g)'s fixed-percentage contribution would be superfluous. Maj. Op. at 57. Setting aside that the majority's view makes Section 718(f) redundant twice over—essentially repeating Sections 718(a) and (g)—I do not see why a steady stream of funding every pay period is pointless just because more is coming later. 3 V.I.C. § 718(h) (1968) (requiring contributions "each payroll period."). GERS, like any "corporation," must regularly tend to "debts, obligations,

24

contracts, . . . expenditures, facilities, and property," *id.* § 701(c), other "administrative expenses," *id.* § 718(f), and, critically, investments. And all persons, real or legal, "[r]emember that Money is of a prolific generating nature. Money can beget Money, and its Offspring can beget more, and so on. . . . The more there is of it, the more it produces every Turning, so that the Profits rise quicker and quicker." Benjamin Franklin, *Advice to a Young Tradesman (1748)*, in The Works of Benjamin Franklin, Vol. II 87, 87–88 (Jared Sparks ed., Hilliard, Gray & Co. 1840). The ADEC, dependent as it is on the Legislature's response to a once- or twice-annual "actuarial reserve" calculation, 3 V.I.C. § 718(e), may not satisfy these urgent demands. And even if a robust ADEC disbursement leaves Section 718(g)'s regular income stream with "little to do, that's hardly a reason to abandon it," for it is "not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what [the Legislature] might have intended." *Wis. Cent. Ltd.*, 138 S. Ct. at 2073. If Section 718(g) would then do nothing at all, that is not dispositive either. "Sometimes the better overall reading of the statute contains some redundancy." *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).

The majority next argues that the statutory history proves that Section 718(f) merely creates an aspirational goal that the Section 718(g) fixed-percentage contributions will ensure actuarial soundness. Because the 1959 version of the statute also obligated the employer to ensure actuarial soundness but defined "the amount of contributions by the employer" as "determined by applying a percentage rate to the aggregate compensation of the members for each regular payroll period," the "employer contribution" described in the amended statute must bear this meaning too. Maj. Op. at 57–

25

58, quoting Act of June 24, 1959, No. 479, § 718, 1959 V.I. Sess. Laws 92, 110.

I disagree. The majority looks to statutory language[28] stricken from the statute in 1968. Act of Feb. 8, 1968, No. 2098, § 718(f), 1968 V.I. Sess. Laws, Pt. I, 9. The 1968 amendments also bifurcated the "adequate actuarially determined reserve" funding obligation and the fixed-percentage contribution obligation into separate sections, (f) and (g), respectively. *Id.* at 9–10. These revisions are telling. After 1968, the employer's obligation to ensure actuarial adequacy remained (new § 718(f)), but "the amount of contributions by the employer" (§ 718 para. 5 (1959)) was no longer exclusively tethered to employee salaries (new § 718(f)–(g)). "To my mind, [the Legislature]'s decision to remove the *only* language that could have fairly captured" the majority's reading "cannot be easily ignored." *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 907 (2019) (Gorsuch, J., dissenting).

Nor does Section 718(g)'s "detailed schedule of percentages" transform Section 718(f)'s less-detailed description of the ADEC into the always-dreaded "elephant in a mousehole." Maj. Op. at 58. As enacted, the ADEC may not have been an elephant. As recently as 1999, the "additional required contribution for the year" necessary to achieve actuarial adequacy was $24 million. JA127. Each of the next two years, the GVI's actuarially determined contributions fell ~$21 million short. The GVI's underfunding snowballed, soon

---

[28] That "the amount of contributions by the employer for the various purposes of the system shall be determined by applying a percentage rate to the aggregate compensation of the members."

26

requiring GERS to liquidate investments in a futile attempt to tame the growing "elephantine mass" of debt. *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 821 (1999). Section 718(f) is not an elephant in a mousehole so much as a mouse in a mousehole who, neglected by the homeowner, spawned a family of mice. In any event, counting how much debt piled up over decades of non-compliance does not answer whether the GVI must pay that bill. Elevating poor performance to a defense against legal duty would make for quite a rodent's nest in which anyone can hide from statutory obligations.

Finally, the majority looks beyond the statute to the testimony of GERS representatives before the Legislature in 1997 and 2005. To the majority, this proves that GERS understood that Section 718(f) does not require the ADEC. Maj. Op. at 62–66.[29] Respectfully, I am not sure why this

---

[29] The majority also cites a stray comment from a Virgin Islands Senator acknowledging that "the government throws in an additional percentage" on top of employee contributions "and that creates a pool of money for [GERS]." Maj. Op. at n.34, quoting Sept. 26, 2005 Reg. Sess. (Part II) Hrg. Tr. 46:2–6. The majority suggests this shows that legislators shared GERS's understanding that Section 718 only requires fixed-percentage contributions. At best, this statement describes how Section 718(g) works. It says nothing about Section 718(f) nor suggests the Legislature did not recognize the ADEC obligation. We should not "allow[] ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011).

Even more to the point, this is a problematic way to discern the meaning of Section 718. "State legislatures are

27

ancient testimony in a legislative hearing matters, for "legislative history is not the law," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018), and "'[p]ost enactment legislative history is not a reliable source for guidance' in assessing the ordinary meaning of a statute." *Johnman*, 948 F.3d at 620 n.8 (alterations in original) (quoting *Pa. Med. Soc'y v. Snider*, 29 F.3d 886, 898 (3d Cir. 1994)). The testimony of non-legislators is of the least authoritative sort. *See* William M. Eskridge, Jr., Phillip P. Frickey & Elizabeth Garrett, *Legislation and Statutory Interpretation* 317 (2d ed. 2006). If the thought is that GERS's statement is reliable as against its own interest, then why would the majority dismiss as irrelevant the GVI's recent admission through counsel that "[t]here is an obligation to pay" the ADEC (but the Consent Decree does not incorporate it)? Maj. Op. at n.28, citing JA1786–88. If one party's understanding of this text is all but dispositive, the other's is at least relevant. Of course, neither is either of those things, because "[o]ral testimony of witnesses . . ., can seldom be expected to be as precise as the enacted language itself." *Regan v. Wald*, 468 U.S. 222, 237 (1984). Determining the

---

composed of individuals who often pursue legislation for multiple and unexpressed purposes . . . [W]hat percentage of the legislature must harbor [this view] before we can impute it to the collective institution? . . . And if trying to peer inside legislators' skulls is too fraught an enterprise, shouldn't we limit ourselves to trying to glean legislative purposes from the statutory text where we began?" *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1906–07 (2019) (Gorsuch, J., plurality opinion). This difficulty is why "[f]loor statements from [one] Senator[] cannot amend the clear and unambiguous language of a statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 (2002).

meaning of a statute "by such colloquies, . . . would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on." *Id.*[30]

Reading Section 718(f) out of the statute eliminates Section 718's mandate that the System fund an actuarial reserve. That is why I respectfully decline to join the majority as to Part IV.

## II. ARTICLE III REMEDIES

Beyond the questions of contract and agreement, statutes and best meanings, and the decisions that produced this particular moment in a longstanding crisis, rests a most fundamental problem. The GVI, following the usual course of lawmaking, invoked the legislative powers delegated from the people to commit a portion of the people's property to GERS.

---

[30] This same reasoning should foreclose imbuing the text of the Consent Decree with extrinsic evidence such as GERS' testimony or the parties' conduct. Because we can interpret the contract within its "four corners," including the portions of Section 718 "expressly incorporated in the decree," *ITT Cont'l*, 420 U.S. at 238, our inquiry should end there. No matter the extrinsic evidence, "the parties remain bound by the appropriate objective definition of the words they use to express their intent." *Baldwin v. Univ. of Pittsburgh Med. Ctr.,* 636 F.3d 69, 76 (3d Cir. 2011) (citation and quotation marks omitted). *Accord* Restatement (Second) of Contracts § 203(b) (1981) (in contract interpretation, "express terms are given greater weight than course of performance, course of dealing, and usage of trade"). The Consent Judgment includes "employer contributions" in Section 718, including those required by Section 718(f).

That is how lawmaking works. Then, repudiating that promise, it paid GERS much less. Justly, GERS objects. Insolvent, GVI offers regrets and hopes that tomorrow will bring a better answer. Options abound within the ample powers of the legislative and executive branches. Still more exist in the people of the Virgin Islands, to whom both those public bodies are accountable.

But what of the courts established under Article III? Can they use the judicial power to simply order a sovereign territorial government[31] to pay? Respectfully, the original and,

---

[31] No authority exempts cases arising in the Virgin Islands from the scope of the Article III judicial power. *See, e.g*, *Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012) (affirming dismissal of claim against Virgin Islands as unripe because "[f]ederal courts are only empowered to decide cases and controversies as our Article III jurisprudence defines them.") (internal citation and quotation marks omitted); *United States v. Gov't of V.I.*, 363 F.3d 276, 284 n.3 (3d Cir. 2004) ("The District Court of the Virgin Islands is an Article IV court, but is authorized by statute to exercise jurisdiction equivalent to an Article III court") (discussing 48 U.S.C. § 1612(a)); *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 360 (3d Cir. 2007) (citing 48 U.S.C. § 1613). As noted by the District Court of the Virgin Islands, the territory is subject to the same fundamental separation-of-powers principles that apply throughout our Republic. *See Bell v. Luis*, 528 F. Supp. 846, 850 (D.V.I. 1981) (invalidating Virgin Islands Governor's order seeking to "redirect territorial funds" without legislative authority because the "necessity for 'checks and balances' forms the basis for our constitutional form of government and must be adhered to").

indeed, enduring understanding of the Constitution holds they may not.

## A.    The Judicial Power Holds No Purse

A summary of foundational principles helps frame my concerns. The Appropriations Clause of the U.S. Constitution states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. This clause is not an authorization of spending but "a limitation on executive or judicial action rather than a grant of any power—which is why it appears in Article I, section 9, the portion of the original Constitution that is devoted to direct limitations on various federal actors." Gary Lawson & Guy Seidman, The Constitution of Empire 27 (2004).[32] The Founders found, rather than invented, this "power of the purse" a new noble privilege that "in the history of the British Constitution . . . gradually enlarg[ed] the sphere of its activity and importance, and finally reduc[ed], as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government." The Federalist No. 58, p. 350 (Issac Kramnick ed., 1987) (Madison).[33] Persuaded by that

---

[32] The Appropriations Clause "makes appropriations statutes a precondition to any federal spending, so that presidents and judges cannot spend on their own authority." Lawson & Seidman, The Constitution of Empire 27. It is not the source of Congress's  power to spend. That must be found elsewhere in the Constitution, such as the Property Clause of Article IV. *See id.*

[33] Placing the spending power outside the executive and the judiciary was an innovation of colonial America that led to

31

experience, the Framers and Ratifiers hoped to give the people of the new American Republic the same power "to resist the royal tax collectors, to assert their right of being asked for their consent to new or exceptional levies . . . to determine the expenditures of the government." Carl Friedrich, *Constitutional Government and Democracy* 281 (1965).[34]

the rise of the colonial assemblies. *See* Christine A. Desan, *The Constitutional Commitment to Legislative Adjudication in the Early American Tradition*, 111 Harv. L. Rev. 1381, 1391 n.23 (1998) (gathering sources). In fact, "no provisions appear to contemplate suits that would allow recovery for colony obligations such as those of contract and taking." *Id*. at 1444–45. The Constitution enshrined that limit, and the record shows that even contractual claims against the government required an appeal to the legislature, not the court. "[W]hile the right to indemnity was understood in contractual terms, the practice of securing a determination of the right to indemnity almost invariably entailed the submission of a petition to Congress for the adoption of private legislation." James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1866 (2010).

[34] The commentaries from the first American generation share this conclusion. For example, St. George Tucker's influential *Blackstone's Commentaries* connects the rights of the people to the appropriations approved by the legislature:

> All the expenses of government being paid by the people, it is the right of the people, not only, not to be taxed without their own consent, or that of their representatives freely chosen, but also to be

Rightly, they viewed the power of the purse "as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58, p. 350 (Isaac Kramnick ed., 1987) (Madison). By design, not historic accident, "the legislative department alone has access to the pockets of the people." The Federalist No. 48, p. 310 (Isaac Kramnick ed., 1987) (Madison). Relegating the appropriations power to the legislature meant "the purse remains, by this Constitution, in the representatives of the people. We know very well that they cannot raise one shilling but by the consent of the representatives of the people. . . . Every appropriation must be by law." 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 172–73 (Jonathan Elliot ed., 2d ed. 1836)

---

actually consulted upon the disposal of the money which they have brought into the treasury; it is therefore stipulated that no money shall be drawn from the treasury, but in consequence of appropriations, previously made by law: and, that the people may have an opportunity of judging not only of the propriety of such appropriations, but of seeing whether their money has been actually expended only, in pursuance of the same…

St. George Tucker, *Blackstone's Commentaries* 1 App. 362–64, in *The Founders' Constitution*, Volume 3, Article 1, Section 9, Clause 7, Document 3 (Univ. of Chicago Press), http://press-pubs.uchicago.edu/founders/documents/a1_9_7s3.html.

(Maclaine) (responding to Locke's doubts that the federal judiciary would be impartial).[35]

In contrast, the judicial power is as limited as it is independent.[36] Even to the staunchest advocates of federal

---

[35] In that same spirit, the Rhode Island delegates expressed their concerns to Gov. William Greene on the need to guard spending to guarantee liberty:

> The power of the purse is the touch-stone of freedom in all States. If the people command their own money they are free; but if their Sovereign commands it they are slaves. All other strings in government take their tone from the mode of raising money. An alteration therefore in the mode of raising money is an alteration of the Constitution. It is an essential & radical change. A change that, on experience, will be felt most sensibly. It cannot be an indifferent thing, or a matter of small moment. It is like altering the center of gravity. It is like transferring the fee simple of an estate. It is like putting your weapon of defence into another man's hand.

Letters of Delegates to Congress: Volume 20 March 12, 1783 - September 30, 1783, 638 (Sept. 8, 1783), Rhode Island Delegates to William Greene, https://memory.loc.gov/cgi-bin/query/r?ammem/hlaw:@field(DOCID+@lit(dg020542)).

[36] "Th[e] belief in the limited nature of the [court's] equity power was consistent with the framers' broader understanding of the judicial power, which was, in Publius'

authority, this limitation on the judicial power was necessary to affirm Congress's primacy and the complex role of the Executive in faithfully implementing legislative decisions.

Indeed, "[i]n establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (alteration in original) (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (Hamilton)). So the "[j]udicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." *Gamble v. United States*, 139 S. Ct. 1960, 1982 (2019) (Thomas, J., concurring) (quoting *Osborn v. Bank of United States*, 9 Wheat. 738, 866 (1824) (Marshall, C.J.)).[37]

---

opinion, 'beyond comparison the weakest of the three departments of power.'" John Choon Yoo, *Who Measures the Chancellor's Foot? The Inherent Remedial Authority of the Federal Courts*, 84 Cal. L. Rev. 1121, 1159 (1996) (quoting The Federalist No. 78 (Hamilton)).

[37] "Although 'judicial independence' is often discussed in terms of independence from external threats, the Framers understood the concept to also require independence from the 'internal threat' of 'human will.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 120 (2015) (Thomas, J., concurring) (quoting Philip Hamburger, *Law and Judicial Duty* 507, 508 (2008)). Judges ought to guard against these internal threats, which "might include personal biases," because "[i]ndependent judgment require[s] judges to decide cases in

Thus it was the Executive, not the Judiciary, that the Founders saw as most likely to usurp Congress's appropriation power. Key to that balance is "[t]he separation between the Executive and the ability to appropriate funds that was frequently cited during the founding era as the premier check on the President's power." *United States House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020). It was a promise made to allay the fears of Anti-Federalists that the president would soon become a tyrant. *See* Josh Chafetz, *Congress's Constitution, Legislative Authority and the Separation of Powers* 57 (2017); *see also* 3 Elliot's Debates 367 (Madison) (responding to Anti-Federalist claims that the President could make himself king by explaining that "[t]he purse is in the hands of the representatives of the people"). This is why Madison called the power of the purse "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people . . . ." The Federalist No. 58, p. 350 (Isaac Kramnick ed., 1987) (Madison). And Hamilton persuaded those at the New York ratification convention by telling them, "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 Elliot's Debates 349 (Hamilton).

The history of the constitutional debates makes clear that the purse belongs only to the people who, through a conscious delegation of agency, entrust that awesome privilege

---

accordance with the law of the land, not in accordance with pressures placed upon them through either internal or external sources." *Id*. at 120–21.

to the legislature.[38] In fact, "the Convention never had in mind that the right of appropriation could be exercised by any branch other than the legislature. . . . There is no warrant to believe that judges had any authority to appropriate money from the treasury." Figley & Tidmarsh at 1252. And "[t]hroughout the debates, delegates expressed concern for the 'purse strings' or the 'purse' — always regarding the protection of the people's money as a legislative function. No delegate voiced the opinion that the judicial branch would have any say in the government's finances." *Id.* at 1253. From our earliest days, the judicial power was appropriately limited in proportion to its independence as the only branch of government not beholden to the people through elections. And so we are therefore subject to the "clear restraints" on our authority arising from "federalism and the separation of powers, [which] derive from the very form of our government." *Missouri v.*

---

[38] A review of the historical literature on the appropriations clause gives us both scope and context for these sources. Synthesizing Federalist Nos. 48, 58, 78, and 81, Figley and Tidmarsh highlight how the power of the purse belongs solely to the legislature. "Determining the circumstances under which the government was liable for monetary relief was a legislative, not a judicial, function." Paul F. Figley & Jay Tidmarsh*, The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1257 (2009). Recounting the history of debating states' debts during Ratification, they write, "the shared understanding of both those favoring and those opposed to the Constitution was that legislatures, which controlled appropriations from the public treasury, controlled the award of claims against the sovereign." *Id.* at 1258.

*Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) ("*Jenkins II*").

## B.     The Historic Protections Against Judicial Spending

Thanks to the clarity of the text of the Appropriations Clause, federal courts have always understood they lack power to order money judgments against the coordinate branches of government—be they federal, state, or local—absent legislative appropriations or, in the rare case, an equivalent and explicit legislative funding commitment. Sometimes, it is called an "established rule" that "the expenditure of public funds is proper only when authorized by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (citing *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850)). Other times, a "historic . . . principle" that "before any expenditure of public funds can be made, there must be an act of Congress appropriating the funds and defining the purpose for such appropriation. Thus, no officer of the Federal Government is authorized to pay a debt due from the U.S., *whether or not reduced to a judgment*, unless an appropriation has been made for that purpose." *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 906 (Ct. Cl. 1976) (citing *Reeside*, 52 U.S. (11 How.) at 290) (emphasis added). But whatever the characterization, the character of the cases is clear: "a treasury, not fenced round" and "subjected to any number of description of demands" from "the undefined and undefinable discretion of the courts" would constitute "an absence of all rule" that would create a government "guided by . . . the uncertain, and perhaps contradictory action of the courts, in the enforcement of their views of private interests." *U.S. ex rel. Goodrich v. Guthrie*, 58 U.S. (17 How.) 284, 303 (1854).

This limitation connects to the limited nature of the judicial power. While the federal courts can decide cases and controversies involving the other branches of government, they cannot order the payment of a judgment against a sovereign absent an appropriation. *See, e.g.*, *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424–26 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."). As a result, Congress needed to appropriate funds for judgments against the federal government, first annually, *e.g.*, Act of June 25, 1864, ch. 147, 13 Stat. 145, 148, now with indefinite guarantees covering most adverse money judgments against the United States. *See* 31 U.S.C. § 1304.

## 1. Open-Ended Money Judgments

The Appropriations Clause is "a core structural protection of the Constitution—a wall, so to speak, between the branches of government that prevents encroachment of the House's and Senate's power of the purse." *Mnuchin*, 976 F.3d at 8. As with all separation of powers issues, our jurisprudence "generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991). So when there is an enforceable obligation—whether by contract or statute— a money judgment can only apply to a legislative appropriation, or a similar statutory mechanism if one exists.[39]

---

[39] For example, upon finding the Government liable for contract damages the Federal Court of Claims observed that "where the Appropriations Clause and the Anti-Deficiency Act

Nor can federal courts compel a government to raise the monies needed to satisfy a money judgment. *INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("'A Court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law . . . .'") (quoting *Rees v. Watertown*, 86 U.S. (19 Wall.) 107, 122 (1873)). The range of equitable remedies not "in violation of law" is extremely narrow. Article III does not permit the use of equitable powers to compel local governments to satisfy judgment debts. *Rees*, 86 U.S. (19 Wall.) at 122. In *Rees*, the Court held that it lacked the power to appoint a receiver to levy and collect taxes to pay a town's municipal bond debt. *Id.* at 108–10, 116. That is because the "power to impose burdens and raise money is the highest attribute of sovereignty," a "power of legislative authority only. It is a power that has not been extended to the judiciary." *Id.* at 116–17.

Similarly, in *Meriwether v. Garrett*, the Court recognized that a writ of mandamus could issue to compel municipal authorities to collect taxes, if they had such authority. 102 U.S. 472, 501–02 (1880). But "if those [taxing] authorities possess no such power, or their offices have been abolished and the power withdrawn, the remedy of the

---

prohibit payment from the United States Treasury," the Court should instead rely on its power to make an "otherwise valid declaration of parties' rights in a contractual claim against the government." *Wetsel-Oviatt Lumber Co., Inc. v. United States*, 38 Fed. Cl. 563, 571 n.9 (1997). Courts must follow the rule that "[w]ithout congressional permission, . . . no money may be paid by the Treasury." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004).

creditors is by an appeal to the legislature, which alone can give them relief." *Id.* at 518. That is because "[n]o Federal court, either on its law or equity side, has any inherent jurisdiction to lay a tax for any purpose, or to enforce a tax already levied, except through the agencies provided by law." *Id.* (further noting that the "Federal court . . . cannot seize the power which belongs to the legislative department of the State and wield it in their behalf"). For dissatisfied creditors, "the remedy is by appeal to the legislature." *Id.* at 501–02. Thus, as modern courts have also found, "where there is no state or municipal taxation authority that the federal court may by mandamus command the officials to exercise, the court is itself without authority to order taxation." *Missouri v. Jenkins*, 495 U.S. 33, 73 (1990) (Kennedy, J., concurring in part) (citing cases).

### 2. Correcting Constitutional Harms

The narrow exception to this rule is that federal courts can order a state to remedy constitutional violations and, in so doing, require the state to incur costs. That is not the case here, as GERS's rights are statutory and contractual. But even when imposing costly remedial schemes on states, federal courts of appeals and the Supreme Court recognize the constraints of Article III.

Aware of this limit, GERS relies on *Missouri v. Jenkins*, 495 U.S. 33 (1990), a case differing in both degree and kind. In *Jenkins*, the Supreme Court affirmed a district court's desegregation order requiring the Kansas City government to pay (along with Missouri) to remedy constitutional violations. *Id.* at 53–54. In doing so, the Court agreed the district court could revise its order to enjoin a state prohibition on local tax increases *and* permit Kansas City to levy taxes adequate to fund the desegregation plan. *Id.* at 54–55. The Court stated that

41

Article III would not bar that remedy because "a local government with taxing authority may be ordered to levy taxes in excess of the limit set by state statute where there is reason based in the Constitution for not observing the statutory limitation." *Id.* at 57. But the funds owed to GERS have no constitutional nexus.

More importantly, *Jenkins* vacated the District Court's order *requiring* the Kansas City government to raise taxes. *Id.* at 50–51. The Court found that was an "intru[sion] on local authority" beyond the district court's equitable powers. *Id.* at 51. Under "principles of comity" governing equitable remedies, "the District Court was obliged to assure itself that no permissible alternative would have accomplished the required task" before taking the "drastic step" of imposing the tax. *Id.* at 50–51. Vacating a mandatory tax increase and, instead, permitting local authorities to determine whether that was necessary on their own, was "more than a matter of form." *Id*. at 51. Rather, it empowered "local authorities [who] have the 'primary responsibility'" for solving desegregation "to devise their own solutions to these problems." *Id.* at 51–52 (citing *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955)). In this regard, *Jenkins* follows Supreme Court precedent prohibiting the Court from assuming the legislature's power to tax.

Our own decisions recognize the same limitations. In *Evans v. Buchanan*, we vacated a district court's denial of Delaware's request to enjoin a local school board from raising taxes to fund a desegregation plan. 582 F.2d 750, 779 (3d Cir. 1978). We remanded for a new hearing because the district court had failed to "extend[] the requisite deference" to Delaware's superseding state tax law "to which legislative

judgments in the field of taxation are entitled." *Id.* at 778. Even in the face of Delaware's egregious failure in desegregation efforts, this Court held that if Delaware's funding proved inadequate "legislators will most certainly receive feedback from their electors" and these "inherent political safeguards . . . should be permitted to run their own course." *Id.* at 790.

That result is significant, showing that even when fundamental constitutional rights are at stake, we cannot simply order a government to spend money. Instead, we require compliance with constitutional obligations, and any spending is incidental or even optional. *See Milliken v. Bradley*, 433 U.S. 267, 295 (1977) (Powell, J., concurring) ("Ordinarily a federal court's order that a State pay unappropriated funds . . . would raise the gravest constitutional issues. But here, . . . the State has been adjudged a participant in the constitutional violations, and the State therefore may be ordered to participate prospectively in a remedy [to provide $5.4 million in funding] otherwise appropriate.")

All of this creates a tight passage for an enforcement order implicating governmental spending to sail. And rightly so, lest we "improperly substitute[] [our] own . . . budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Horne v. Flores*, 557 U.S. 433, 455 (2009) (citing *Jenkins II*, 515 U.S. at 131 (Thomas, J., concurring)). Usurping the powers given to the legislature not only distorts the principles of agency supporting the limited transfer of power from the people to their legislature, it unbalances the finely distinguished roles of the coordinate branches, transforming the least dangerous branch into one not recognized by the Constitution.

## III. CONCLUSION

This case is neither the first nor the last pension controversy. Similar state pension fund cases show that these same separation-of-powers principles prevent state courts from doing what we, as a federal court, dare not. *See Ill. Educ. Ass'n v. State*, 28 Ill. Ct. Cl. 379, 384–89 (1973) (finding that the state had breached its contractual obligations to fund two pensions as required by implementing statutes but any decision to compel the legislature to make appropriations would violate the separation of powers); *see also Valdes v. Cory*, 189 Cal. Rptr. 212, 225 (Cal. Ct. App. 1983) ("[A] court of this state is powerless to compel the Legislature to appropriate such sums or to order payment of the indebtedness").

No less restraint applies to this Court[40], and we must recognize that "[e]xpenditures toward the fulfilment of public

---

[40] In affirming in part the District Court's order the majority notes that "the GVI did not challenge the underlying order—the 1984 consent judgment—as invalid for lack of an appropriation prior to appealing the District Court's enforcement order." Maj. Op. at n.35, citing *United States v. Gov't of V.I.*, 363 F.3d 276, 291–92 (3d Cir. 2004). In *Gov't of V.I.*, we held the GVI's argument was estopped because it had not appealed the December 2001 enforcement order of a 1985 consent decree. 363 F.3d at 292. But estoppel does not expand our jurisdiction into the separate powers of the legislature, because "[l]ike the Constitution's other structural features, '[n]either Congress nor the Executive can agree to waive' the Appropriations Clause." *Keepseagle v. Perdue*, 856 F.3d 1039, 1060 (D.C. Cir. 2017) (Brown, J., dissenting) (quoting *Freytag v. Comm'r Internal Revenue*, 501 U.S. 868, 880 (1991)). The Constitution's limitations on judicial power remain in full

44

policy are integral to policymaking itself, and policymaking is left to the legislature." *Keepseagle v. Perdue*, 856 F.3d 1039, 1059 (D.C. Cir. 2017) (Brown, J., dissenting) (citing *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring)). The Constitution "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by [legislators] as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Richmond*, 496 U.S. at 428.

Some will see a flaw in that design.[41] Through amendment, we might strike a different balance, though "it is by no means certain, that evils of an opposite nature might not arise, if the debts, judicially ascertained to be due to an individual by a regular judgment, were to be paid, of course, out of the public treasury. It might give an opportunity for collusion and corruption in the management of suits between the claimant, and the officers of the government, entrusted with the performance of this duty." Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1343, in *The*

---

force "even if 'the parties' before a court 'cannot be expected to protect them.'" *Id.* (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986)).

[41] Tucker, for one, thought "the constitution and laws of the United States appear, then, to be defective upon this subject." *Blackstone's Commentaries* 1 App. 362–64. But that criticism did not alter his textual analysis, for "whatever doubt there may be upon the subject, under the laws of the state, it seems to be altogether without a question, that no claim against the United States (by whatever authority it may be established,) can be paid, but in consequence of a previous appropriation made by law." *Id*.

*Founders' Constitution*, Volume 3, Article 1, Section 9, Clause 7, Document 4 (Univ. of Chicago Press).[42] Perhaps Story's prescience nearly nineteen decades ago gives insight into the decades of litigation in this matter. One wonders if the simplicity of a judicial pronouncement might be thought easier, more expedient, than summoning the will to face the options for solving the GERS funding problem. Maybe some imagine that pointing to the handiwork of the unelected judiciary will afford a convenient occasion for handwringing and handing off the accountability for the inevitably painful choices about limited tax dollars.

Thankfully, we need not speculate. Because we know, with certainty, that a federal court of limited powers and limited authority under our Constitution cannot play that role.

---

[42] http://press-pubs.uchicago.edu/founders/documents/a1_9_7s4.html.

46